THE PANTASOTE LEATHER CO., NOW KNOWN AS THE PANTASOTE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 12912, 15865. Promulgated April 25, 1949.

*Thomas N. Tarleau, Esq.*, and *Sandow Holman, Esq.*, for the petitioner.

*Francis X. Gallagher, Esq.*, for the respondent.

642

**OPINION.**

KERN, *Judge*: Section 721 of the Internal Revenue Code [1] sought to provide relief to a taxpayer which received an abnormal amount or

---

[1] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the

type of income in one year by permitting it to allocate such abnormal income over the years to which it was properly attributable,[2] and thereby decrease the amount of excess profits tax to which it otherwise would have been subjected. The present controversy seems to us to be limited by respondent's brief [3] to the narrow issue of whether or not all or some part of petitioner's net abnormal income was properly attributable to years other than the ones in which it was earned and received.[4]

---

gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years * * *

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income :

* * * * * * *

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months ;

* * * * * * *

(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

[2] Section 721 (b) is to the following effect :

(b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary. In the case of amounts otherwise attributable to future taxable years, if the taxpayer either transfers substantially all its properties or distributes any property in complete liquidation, then there shall be attributable to the first taxable year in which such transfer or distribution occurs (or if such year is previous to the taxable year in which the abnormal income is includible in gross income, to such latter taxable year) all amounts so attributable to future taxable years not included in the gross income of a previous taxable year.

[3] Respondent, upon brief, states : Counsel for the respondent stated the position of the respondent in his opening statement as follows :

"MR. GALLAGHER : The position of the Respondent can be very briefly stated, Your Honor.

"This so-called abnormal income resulted solely from an increase in business caused by large demands by the armed forces to which the bulk of these manufactured goods were delivered.

* * * * * * *

"* * * it is respectfully submitted that the income realized by petitioner from the two products in question resulted solely from an increase in business due to the enlarged demands of the Armed Forces.

* * * * * * *

"* * * petitioner has at no time faced up to the position of the respondent, namely, that the income in the taxable years in question arose solely from an increase in business caused by the demand of the Armed Forces * * *."

[4] Regulations 109, section 30.721–3, as amended by T. D. 5045, C. B. 1941–1, pages 69 et seq., provides in part :

"AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The mere fact that an item includible in gross income is of a class abnormal either in kind or in amount does not result in the exclusion of any part of such item from excess profits net income. It is necessary that the item be found attributable under these regulations in whole or in part to other taxable years. Only that portion of the item which is found to be attributable to other years may be excluded from the gross income of the taxpayer for the year for which the excess profits tax is being computed.

Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin, and only in such amounts as are reasonable

Respondent apparently has recognized that petitioner did have abnormal income and net abnormal income as defined in the code in both 1941 and 1942.[5]

Respondent assails petitioner's claim for relief under section 721 on the ground that such income arose solely out of an increased demand for petitioner's two products under discussion—Pantex and C. C. Textasote—by the armed forces and, consequently, no part of it was attributable to other years, under the statute and his regulations.

Petitioner does not dispute respondent's premise that items of abnormal income are not attributable to other years to the extent that they have resulted from high prices, low operating costs, or increased volume of sales due to increased demand for the products.[6]

To meet this attack, petitioner has introduced data reflecting the general improvement in business conditions of the industry of which it is a part. By indices derived from these data it seeks to show us the portion of its net abnormal income due to the improvement in such business, and contends that the remainder of its net abnormal income is attributable to other years and is allocable over the years during

---

in the light of such events. To the extent that any items of net abnormal income in the taxable year are the result of high prices, low operating costs, or increased physical volume of sales due to increased demand for or decreased competition *in the type* of product sold by the taxpayer, such items shall not be attributed to other taxable years. Thus, no portion of an item is to be attributed to other years if such item is of a class of income which is in excess of 125 per cent of the average income of the same class for the four previous taxable years solely because of an improvement in business conditions. In attributing items of net abnormal income to other years, particular attention must be paid to changes in those years in the factors which determined the amount of such income, such as changes in prices, amount of production, and demand for the product. No portion of an item of net abnormal income is to be attributed to any previous year solely by reason of an investment by the taxpayer in assets, tangible or intangible, employed in or contributing to the production of such income."

To the same effect, see Regulations 112, section 35.721–3, applicable to taxable years beginning after December 31, 1941.

See also Regulations 109, section 30.721–8, and Regulations 112, section 35.721–7, which provide in part:

"EXPLORATION, DISCOVERY, PROSPECTING, RESEARCH, OR DEVELOPMENT.—

"In general, an item of net abnormal income of the class described in this section is to be attributed to the taxable years during which expenditures were made for the particular exploration, discovery, prospecting, research, or development which resulted in such item being realized and in the proportion which the amount of such expenditures made during each such year bears to the total of such expenditures. Allocation of items of net abnormal income of the class described in this section must be made according to the principles set forth in section 35.721–3."

[5] Petitioner has selected as the class of abnormal income, income resulting from research and development of two products—Pantex and C. C. Textasote—extending over a period of more than 12 months, as defined in section 721 (a) (2) (C). It does not claim that such income is abnormal in type, but rather that it is abnormal in amount, i. e., that it is in excess of 125% of the average amount of the gross income of the same class for the four previous taxable years.

[6] In *W. B. Knight Machinery Co.*, 6 T. C. 519, 534, we said in part:

"But the mere fact that a taxpayer has net abnormal income in a taxable year does not entitle it to relief under section 721. There must be a further finding under the evidence as to what part, if any, of such net abnormal income is attributable to other years. If none is so attributable, then the taxpayer gets no relief. * * *

"First, we know that no part of such income can be so attributed which was due solely to improvement in business conditions. * * *"

See also *Premier Products Co.*, 2 T. C. 445; Rept. No. 146, 77th Cong., 1st sess., p. 9.

which its research and development program was in operation. The technique is not unlike that followed in the *Knight* case, *supra;* *Rochester Button Co.*, 7 T. C. 529; and *Ramsey Accessories Mfg. Corporation*, 10 T. C. 482.

In order to support the reasonableness of these indices, petitioner has further attempted to demonstrate that actually no part of its abnormal income in the years before us can be said to have resulted from any of the conditions recited in the regulations which preclude attribution to other years. The argument advanced is that the demand in a normal peace time market for the products which it could have manufactured under a newly developed process would have been greater than that indicated by its sales of Pantex and C. C. Textasote but for the fact that the raw materials necessary to make these products were not available, due to the advent of the war. Petitioner seems to misconstrue a dictum in *Soabar Co.*, 7 T. C. 89, 97, as supporting its thesis. It is there stated:

A case could be imagined in which the business normally to be expected from new patents or processes was still in the development stage in 1940 and 1941, so that a part of the increased profits of those years was not due to an increased demand resulting from war stimulated business, but was merely the realization in those years of growth (increase in profits) that would have occurred under normal conditions if there had been no war. * * *

Petitioner is not seeking to prove what demand would have been a "normal" market for the particular products here under discussion, but rather what the demand might have been for some other types of new products that it might have been able to develop as a result of perfecting a new process if necessary raw materials were available. Much must be speculated in resolving issues under section 721, but not that much, we believe. Even if there were some merit in this contention of petitioner by way of supporting the reasonableness and usefulness of the index figures it has offered, the testimony upon which the argument is predicated is at best vague and unsatisfactory, and hardly supports petitioner's conclusion that in a peace time economy its income would have been as large as that realized through its sales of products for war end uses.[7]

---

[7] The testimony of one of petitioner's vice presidents was, in part, as follows:

"Q. Well, assuming we had not been in the War during 1941 and 1942, and that a normal peacetime market prevailed, what would you say was the extent of the demand of the market for the fabrics which could have been manufactured on those calenders?

* * * * * * *

THE WITNESS: Can I now ask a question? Are you now speaking of all calenders, or are you speaking of this?

* * * * * * *

By MR. TARLEAU:

"Q. I'm talking about the thermoplastic resin.

"A. That, I think, is a very difficult question to answer. I won't attempt to answer it other than to say this: That there was a demand, the demand was coming along very fast, but to tell you what the demand would be, I could not answer that.

* * * * * * *

That the actual income petitioner derived in the two years before us was, to a great extent, the result of increased demand and improvement in business accentuated by the war economy becomes at once apparent from the figures representing petitioner's sales of the products herein considered. For example, sales of C. C. Textasote more than tripled from 1940 to 1941, and approached that increase from 1941 to 1942. And it should further be observed that the basic development of this product was completed by 1939.[8] The increases in the sales of Pantex were even greater, but as to that product basic development continued into the years before us. It was increases in income caused by the impact of the war upon the nation's economy that the excess profits tax sought to reach, and abnormality in income so caused "would not suffice to justify special relief." *Lindstedt-Hoffman Co.*, 11 T. C. 584; *Soabar Co.*, *supra*.

While we can not agree with petitioner that as large a part of its abnormal income is attributable to other years, as it seeks to have us find, we can not agree with respondent that all of it resulted "solely[9] from an increase in business due to the enlarged demands of the Armed Forces." To the extent that respondent's argument is directed to precluding relief to petitioner merely because the bulk of its production during the years in question was sold for use by the armed forces, we consider that it goes too far. The statute does not permit of such construction and, in fact, the legislative intent appears to have been otherwise. See 86 Cong. Rec. 11250. Moreover, our decision in *Eitel-McCullough, Inc.*, 9 T. C. 1132, upon which respondent strongly relies, recognized that despite the fact that "the bulk of petitioner's production * * * was for the Army and Navy * * *. Undoubtedly, some of petitioner's income * * * was the product of research and development * * *." There, relief was denied because of a complete absence of proof, among other reasons. We said, in part (p. 1147):

* * * There is no proof, however, from which we can formulate an approximation or even a guess of the amount properly attributable to the vital factors. Thus it is, there is no way on the record made by which to determine in either the

---

"Q. Can you express an opinion as to the volume of sales which the Pantasote Company might have developed with these various calender products that you mentioned as end products if they had been introduced in 1941 and 1942?

\*     \*     \*     \*     \*     \*

"The Witness : That too is a very difficult answer. * * *

"By Mr. Tarleau :

"Q. Well, assuming that there were other limitations or bottlenecks in the production, and that the dollar volume of production was not a million dollars but was limited to three hundred thousand dollars, do you think you could have sold three hundred thousand dollars worth of the product?

"A. I think that would have been a very si nple thing for any one man to do."

[8] Cf. *Soabar Co., supra*, pp. 96 and 97.

[9] " 'Solely' leaves no leeway." *Helvering* ᴠ *Southwestern Consolidated Corporation*, 315 U. S. 194, 198.

base period or the tax years the amount of income attributable to research and development and the amount attributable to manufacturing under improved business conditions, with the consequent inability to determine the amount of petitioner's abnormal income, if any.

Although the "record leaves something to be desired," *Rochester Button Co., supra*, p. 552, we do not find that complete failure to meet the onerous burden placed upon taxpayers under section 721 that prevailed in the *Eitel-McCullough* case, *supra*. See *Ramsey Accessories Mfg. Corporation, supra; Lindstedt-Hoffman Co., supra*.

Unlike our conclusion in such cases as *Geyer, Cornell & Newell, Inc.*, 6 T. C. 96, and *Soabar Co., supra*, p. 97, we do not believe that in the instant case all of petitioner's "net abnormal income of the tax years was due [solely] to improved business conditions in the tax years which resulted in a greater demand for the petitioner's products in those years." We are convinced that some portion was the result of petitioner's long and intensive research program, and, therefore, is attributable to those years in which the program was being carried on.

We are now confronted with the difficult task [10] of determining what part of petitioner's net abnormal income is attributable to the years during which the products were developed. Undoubtedly, "a consideration of so general a nature would still necessarily reduce in the last analysis to a matter of opinion," *Rochester Button Co., supra*, at page 553, upon which we must exercise "common sense and judgment in the light of the proven facts." *Ramsey Accessories Mfg. Corporation, supra*, at page 489. We have found as a fact what percentages we believe should be applied in reducing petitioner's net abnormal income in the determination of what part thereof arose out of its research and development, and what part arose out of other factors. Cf. *Cohan v. Commissioner* (CCA-2), 39 Fed. (2d) 540; *Ramsey Accessories Mfg. Corporation, supra;* and *Lindstedt-Hoffman Co., supra*. These ultimate findings, based upon a careful consideration of the whole record, decide the only controverted issue presented to us.

Since respondent's sole contention is that petitioner's net abnormal income was attributable to the taxable years, rather than to prior years, because of the increased demand in 1941 and 1942 for petitioner's products by the armed forces, and does not rely upon or mention any other factor (cf. *Ramsey Accessories Mfg. Corporation, supra*), it is unnecessary to speculate upon the existence in the instant case of factors shown to be material in the *Ramsey* case.

Reviewed by the Special Division.

*Decisions will be entered under Rule 50.*

---

[10] What Judge Learned Hand said in a wholly different connection is appropriate here: "The one sure way to do injustice in such cases is to allow nothing whatever upon the excuse that we cannot tell how much to allow." *Commissioner* v. *Maresi* (CCA-2), 156 Fed. (2d) 929, 931.