BREEZE CORPORATIONS, INC., PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket No. 20975.   Promulgated March 8, 1951.

*Sydney A. Gutkin, Esq.*, and *David Beck Esq.*, for the petitioner.
*Francis X. Gallagher, Esq.*, for the respondent.

OPINION.

DISNEY, *Judge:* Our only question is whether the petitioner received during the taxable year 1941 from the sale of rotating antenna mounts and armor plate net abnormal income that was attributable to any previous taxable year or years so as to be entitled to relief for the

taxable year 1941 under the provisions of section 721 (a) (1) and (a) (2) (C) of the Internal Revenue Code.[1]

The petitioner contends that in 1941 it had gross profit from antenna mounts and armor plate in the amount of $2,021,962; that since its average therefrom in 1937–1940, inclusive, was a minus figure, 125 per cent of such average was zero, so that the entire $2,021,962 was in excess of 125 per cent of average, giving petitioner, after adjustment, net abnormal income of $1,801,096 for attribution to the years of development.

Because if sustained it disposes of this case, we first consider the respondent's contention that the petitioner has failed to prove that its claimed abnormal income during the taxable year was not the result of increased physical volume due to increased demand for the taxpayer's product and, therefore, has failed to show that any income is attributable to previous years, and that the petitioner's income is the type intended to be reached by the excess profits tax provisions. This entails examination of the structure of section 721, including subsection (b). Abnormal income is defined by section 721 (a) (1), with references to class of income, and subsection (a) (2) therefore classifies income, while subsection (a) (3) provides for ascertainment of net abnormal income. So far there is no provision as to what is to be done with or about such abnormal income. Then subsection (b) provides that:

The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined *under regulations prescribed by the Commissioner* with the approval of the Secretary. * * * [Emphasis added.]

This is the only statutory authority for attributing the net abnormal income of one year to any other. Rather remarkably, there is no affirmative requirement that it shall be so attributed or regarded. This accentuates the fact that the matter of attribution to or use of such income in other years for tax purposes is specifically left to the Commissioner. By his regulations he is to determine how much is to be attributed to other years. The fact that section 721 is a part of

---

[1] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, * * *.

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:

* * * * * * *

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months; or

* * * * * * *

Chapter 2, Subchapter E, the law as to excess profits tax, passed in 1940, and that the effect of attribution of income to 1939 and earlier years is to except it from excess profits tax, as well as divide it, gives special significance to the provision of subsection (b) that the Commissioner shall determine attribution of tax to other years. The resultant diminution of taxes is made an administrative matter, within his regulatory control. Pursuant to subsection (b), Regulations 112, section 35.721–3 was issued, stating in part here pertinent:

> The mere fact that an item includible in gross income is of a class abnormal either in kind or in amount does not result in the exclusion of any part of such item from excess profits net income. * * *
> * * * To the extent that any items of net abnormal income in the taxable year are the result of * * * increased physical volume of sales due to increased demand for or decreased competition in the type of product sold by the taxpayer, such items shall not be attributed to other taxable years. * * *

In our view, the intent and effect of the regulation is to deny either outright exception from the excess profits tax law (because of attribution to years before its passage) or partial exception by division between two or more years, of income resulting because of the armament program, or war, at which the excess profits tax was aimed. This aim is clearly apparent, for the regulation expressly refers to excess profits, saying that the mere fact of abnormality of income does not result in exclusion of any part of such income "from excess profits net income." In other words, exclusion from excess profits income is synonymous with attribution. Increased demand was in the mind of the Commissioner in drawing the regulation; and plainly it was the increase from war or preparation therefor. It is, under the regulation, clear that, though subsection (a) (2) (C) designated "research, or development," etc., as a separate class of income, the mere designation does not confer the right to attribution of such type of income to other years, if the income was due to increased physical volume of sales due to armament-program-increased demand. That in a general sense, and as a less proximate cause, the research or development may have contributed or led to the income appears immaterial to the object of the regulation. Moreover, even if the research or development was considered as resulting in the income, it does not result in *attribution* thereof to other years. Indeed this can hardly be denied, for certainly "income resulting from * * * research, or development * * *," within the text of subsection (2) (C), is among "items of net abnormal income"—as claimed—in the words of the above regulation, and it succinctly prescribes that

> * * * To the extent that *any* items of net abnormal income * * * are the result of * * * increased physical volume of sales due to increased demand * * * such items shall not be attributed to other taxable years. [Emphasis added.]

"Any" items includes items from research. In short, despite their falling in class (a) (2) (C)—or any other particular class—such items, if due to increased demand, shall not give rise to attribution to other years. A contrary conclusion would be inconsistent with the previous language of the regulation, above noted, that mere inclusion of an income item in an abnormal class—kind or amount—does not result in exclusion of "any part" of such item from excess profits net income. In other words, no item of abnormal income (though made so because of inclusion, for example, in a class resulting from research) can be attributed, to the extent that it results from increased demand. This petitioner's alleged class did, beyond argument. Sales of antenna mounts jumped from $28,194 in 1940 to $4,644,403 in 1941, and sales of armor plate from practically nothing in 1940 to $534,014 in 1941.

The regulation is not attacked by petitioner. Since attribution was by Congress expressly left to regulation, successful attack would appear very difficult. At any rate, the regulation has been variously upheld. *Primas Groves, Inc.*, 15 T. C. 396; *Soabar Co.*, 7 T. C. 89; *Eitel-McCullough, Inc.*, 9 T. C. 1132.

Indeed, the gist of the petitioner's only answer to the respondent's view that this income is not attributable to other years, because due to increased demand, is that "the demand therefor ante-dated the taxable year in question, and, axiomatically ante-dated the war." This expression of desire to place these matters earlier than the outbreak of war seems tacit agreement that the war program affected the tax situation. It is argued that with the exception of five antenna mounts ordered in 1941 all, though shipped in 1941, were shipped pursuant to orders given in 1940, and that the appropriation for antenna mounts had been included in the budget for the fiscal year 1940, also that the orders would have been given "war or no war" in large amounts.

In short, petitioner's sole point appears to be that the demand did not increase in 1941. This attitude is emphasized in the heading to its argument upon reply brief, to the effect that its main brief refutes the respondent's contention that the petitioner "has failed to prove that no portion of its 1941 sales from antenna mounts was due to increased demand during that taxable year." The petitioner's view is narrower than the regulation and narrower than the respondent's argument, for neither refers to increase, of demand, *in the taxable year*. We can conceive of no reason why a demand arising or increasing prior to the taxable year but resulting in no sales until the taxable year should be excluded from the concept of the regulation, which is merely to the effect that if the sales are due to increased demand the income therefrom is not attributable to former years. Here, on peti-

tioner's own and only argument, the demand resulted, in general, in orders in 1940 and 1941, which were filled in 1941. This matter can be viewed in two ways: first, that the demand in 1940 was ineffective since it could not be, and was not, fulfilled until 1941 and, therefore, became an effective demand only in the latter year, but that, secondly, it is immaterial as to when the demand increased so long as it resulted in the sales in the taxable year. It did increase and it did, it is alleged, result in "net abnormal income in the taxable year" within the language of the regulation. The idea that the demand must have increased for the first time in the taxable year seems to us wholly unsound. We have no doubt that demand ordinarily, and broadly speaking, precedes production, and that the regulation was not intended to restrict the increase of demand to the year of supply thereof, that is, to the year of sale.

The petitioner argues also that disqualification from relief because the product was sold exclusively to the United States Government during 1941 would mean that no taxpayer supplying the Government with products for military use in times of peace would ever qualify for relief; and cites *Keystone Brass Works*, 12 T. C. 618, and *Pantasote Leather Co.*, 12 T. C. 635. The short answer is that, as we hereinafter set forth, this is not a question of times of peace but of preparation for war. Moreover, neither case involved a secret development exclusively for the United States Government, such as antenna mounts here, of something the demand for which was solely created by and could be sold only to the Government. *Keystone Brass Works* involved bushings for aircraft engines for a manufacturer thereof. *Pantasote Leather Co.* involved a company which had started research in 1931, primarily upon two products and substantially all devoted to the creation of products satisfactory for use by the armed forces, although the products developed had wider application and as to one product there were limited sales to commercial users. The respondent contended that the income for 1942 was solely due to increased demand. The petitioner argued that the demand in a normal peacetime market for its products would have been *greater* had there been no war, therefore that no part of its abnormal income came within the regulation. We said, in part:

* * * It was increases in income caused by the impact of the war upon the nation's economy that the excess profits tax sought to reach, and abnormality in income so caused "would not suffice to justify special relief." * * *

The respondent argued that the petitioner was entitled to no relief because the bulk of its production was for use by the armed forces. We found that a portion of the income resulted from increased demand and a portion was attributable to other years. In both cases we gave some relief. Neither case is authority that in a situation such

as here presented the income was not wholly the result of increased physical volume of sales due to increased demand. Here the growing demand of the Government was the initial cause of the research, so that the income is seen as attributable throughout to increased demand.

Petitioner appears impressed by the fact that the demand and the production antedated the actual entry of the United States into war. This seems to us to be immaterial. The products were military products and designed for use by the military forces, whether in war or in preparation for defense or war.

In *Lindstedt-Hoffman Co.*, 11 T. C. 584, we referred to the existence of the European war and the domestic armament program as the very aspect of the economy which motivated the excess profits tax and said:

> If all of the abnormal income could be thus characterized, its abnormality would not suffice to justify special relief. Precisely such increases over the base period were the objective and the rationale of the tax.

Here we think all of the abnormal income "could be thus characterized."

*Eitel-McCullough, supra,* involved the manufacture of high frequency vacuum tubes and research, development, and sale from 1934 to 1942. The taxable years were 1941 and 1942. We held that a very large part of the increase in petitioner's sales in those years was due to the impact of the war in Europe on American business economy with unusual demand of the defense and armament program. We noted that the first large contract under that program was received in 1940. Quoting from *Soabar Co., supra,* we held that the petitioner had failed to prove a case under section 721 (a) (2) (C).

In *Steel or Bronze Piston Ring Corporation,* 13 T. C. 636, there was involved the manufacture of piston rings and the years 1942 and 1943. Most of the petitioner's production went into the manufacture of equipment or materials for war use, its rings being used in airplane engines, landing gears, gun turrets, and other equipment. Uniformed officers were stationed in the plant to inspect and expedite war production. It was contended that the income resulted from research and development and was therefore abnormal under section 721 (a) (2) (C). Petitioner had from its inception conducted a certain amount of research and experimentation in piston ring manufacturing. Though stating that undoubtedly the petitioner had done much to improve its production and its manufacturing processes, we held that its large volume of business in the taxable years was not due to the use of patents, exclusive rights, or special manufacturing technique which it had developed, and said:

> * * * Rather, we think, it was due to the increased demand for piston rings of all types as a result of the war.

* * * There is nothing in the evidence to support the claim that in the absence of the war-stimulated increase in the demand for piston rings the petitioner would have met with any materially greater success in 1941, 1942, and 1943 than it had enjoyed in prior years.

The Commissioner's regulations provide that abnormal income resulting from increased sales due to increased demand for the taxpayer's products may not be attributable to prior years. Sec. 35.721-3, Regulations 112. * * *

In *Soabar Co., supra*, we noted that the profits of a taxpayer for the base period years were, for the purpose of the Excess Profits Tax Act, to be regarded as normal in most cases, and that the tax was to be applied generally to the excess of profits of the tax year over the prior normal profits, but that Congress indicated to some degree abnormal situations and left a great deal to the administration of the Commissioner, directing him to prescribe regulations, to carry into effect and to implement many of the statutory provisions. Referring to the broad purposes of Congress in the excess profits tax provisions, we further said:

* * * The legislative history of the Second Revenue Act of 1940 and of the Excess Profits Tax Amendments of 1941 shows that the two major purposes of the provisions were, first, to provide additional revenue urgently needed to help meet the costs of national defense program and, second, to prevent the rearmament program from furnishing an opportunity for the creation of new war millionaires or the further substantial enrichment of already wealthy persons. The tax was to apply to corporate profits from all sources, except that every reasonable precaution was to be taken to prevent unfair application of the tax in abnormal cases. * * *

Petitioner, on brief, dealt primarily with this question as it concerned antenna mounts. Its only argument, applicable to armor plate, is as follows:

Much of what has heretofore been said is equally applicable to petitioner's 1941 gross income resulting from the sale of armor plate. Here, too, the testimony is clear and uncontradicted that petitioner received at least three orders in 1940, and others during 1941, all ante-dating the outbreak of hostilities. The demand for armor plate in 1939 would have greatly exceeded petitioner's production capacity, and, accordingly, no portion of petitioner's gross income from this item was due to an increased demand for the product in 1941.

We conclude that the considerations above discussed apply to armor plate. Petitioner sold only a very small amount of armor plate prior to 1941; that is, it made a few minor shipments in 1940. Thus, the sales in 1941 were due to increased demand. Petitioner considers the two products (i. e., antenna mounts and armor plate) on equal footing, and since the evidence in regard to the increased demand proposition as to armor plate is extremely sparse, we deem it unnecessary to devote a separate discussion to that subject.

Clearly the statute and regulations, above discussed, require that after an amount is shown to be includible in abnormal income we

must then in order to ascertain its attributability to other years consider to what extent the amount is the result of increased physical volume of sales due to increased demand.  The Government and its armament program was, as to antenna mounts, (and as above seen petitioner makes no distinction between the two products) the source of demand, for the development was so secret that it could be neither sold to nor even discussed with another.  As we indicated in *Soabar Co., supra*, without the Government's demand (and as above indicated its demand for these new products is increased demand) "petitioner would not have had any net abnormal income" in 1941.  There was, rather suddenly, an increased demand, and this increased demand resulted in the sales.  Without it the petitioner would merely have conducted some research and development—upon propositions resulting in nothing to it.  Petitioner acted, obviously, with the hope of selling, but if for any reason, such as change of plans on the part of the Signal Corps, no orders had been given, it is clear that there would have been no income to petitioner.  Many examples of research and development are no doubt unsuccessful, creating no demand for the product.  Under the statute and regulations the income was the fruit of increased demand, not of research and development.  See *Differential Steel Car Co.*, 16 T. C. 413.  We conclude and hold that all of the abnormal income in the instant case was due to the increased demand created by the armament program, the very element of our economy motivating the excess profits tax law, and, therefore, that no part of the abnormal income during the taxable year 1941 is attributable to any previous taxable year or years within the meaning of section 721 (a) (1) and (a) (2) (C) of the Internal Revenue Code and the regulations.

This conclusion renders it unnecessary to discuss other arguments advanced by the parties.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*

---

BLACK, *J.*, dissenting: I dissent from the majority opinion wherein it holds that none of petitioner's net abnormal income can be attributable to prior years when research and development took place because petitioner's production of rotating antenna mounts and armor plate went into supplying the United States Government's armament program.  It seems to me that the holding of the majority opinion that none of such net abnormal income can be attributable to prior years under the Treasury regulation relied upon does violence to such cases as *Keystone Brass Works*, 12 T. C. 618, and *Pantasote Leather Co.*, 12 T. C. 635.

I, therefore, respectfully record my dissent.