*Decision will be entered under Rule 50.*

THE OHIO MACHINE TOOL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 26607. Promulgated May 20, 1952.

*Walter J. Mackey, Esq.,* for the petitioner.
*Lester M. Ponder, Esq.,* for the respondent.

OPINION.

VAN FOSSAN, *Judge:* The only issue before us is whether or not the petitioner may be granted the relief provided in section 721 (a) (2) (C) of the Internal Revenue Code[1] because it had net abnormal in-

---

[1] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four

come of the class specified in that section which was attributable to years other than 1942 and 1943.

The facts demonstrate that the Ohio Machine Tool Company developed and then put on the market improved boring and milling machines during the 1930's. The development of these machines required research and experiment over a period of several years before the machines were ready for sale. When the machines were placed on the market they were not unique inasmuch as competing firms produced and sold boring and milling machines to do similar work. However, two patents were issued upon novel features of the "Ohio Dreadnaught" and precautions were taken by the petitioner to establish prior uses of other improvements.

The petitioner seeks to qualify for relief under section 721 (a) (2) (C) on the basis of a class of income resulting from research and development of tangible property extending over a period of more than 12 months. The income in question was derived from the sale of "Ohio Dreadnaught" and "Ohio Production" machines in 1942 and the sale of "Ohio Dreadnaught" machines in 1943. In so far as the income from the machines in these years resulted from development, which development extended over a period of more than 12 months, it falls within the definition of a separate class of income under section 721 (a) (2) (C). *Morrisdale Coal Mining Co.*, 13 T. C. 448. The gross income from the new machines in these years exceeded 125 per cent of the average gross income of the same class for the previous 4 years. Under the terms of the statutory definition abnormal income

previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income:

\*     \*     \*     \*     \*     \*     \*

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months; or

\*     \*     \*     \*     \*     \*     \*

All the income which is classifiable in more than one of such subparagraphs shall be classified under the one which the taxpayer irrevocably elects. The classification of income of any class not described in subparagraphs (A) to (F), inclusive, shall be subject to regulations prescribed by the Commissioner with the approval of the Secretary.

(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

(b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary. \*   \*   \*

was received by petitioner. *Geyer, Cornell & Newell, Inc.*, 6 T. C. 96. The petitioner seeks to attribute the net abnormal income for 1942 and 1943 to the prior years of development and research.

The respondent takes the position that the increased sales were the direct result of an increased wartime demand for machine tools and thus not attributable to other years under the controlling regulations.[2] The respondent contends that the entire increase in petitioner's income was due to improvement in business conditions. With this we must disagree. All of petitioner's increased income cannot be attributed to improved business conditions without regard to the effects of petitioner's research and development. Unlike the situation found in *Soabar Co.*, 7 T. C. 89, the increase in petitioner's income resulted, in part at least, from something inherent in the business. When the large increase in sales of the two new machines is examined against the background of the industry as a whole, it is readily apparent that petitioner's sales increased at a greater rate than is true of the machine tool industry. We have little doubt that the improved machines would have attracted increased sales interest without the benefit of a wartime demand. A considerable segment of petitioner's increased income in 1942 and 1943 was directly attributable to the successful development of the improved machines which constituted the fruition of petitioner's initiative and enterprise. This is nonetheless true though an entirely new machine was not invented. There is no statutory requirement that the product resulting from the development be completely novel and it suffices if improvement of an existing article is attained through original research and development. *Keystone Brass Works*, 12 T. C. 618.

---

[2] Regulations 112:

Sec. 35.721–3. Amount Attributable to Other Years.—The mere fact that an item includible in gross income is of a class abnormal either in kind or in amount does not result in the exclusion of any part of such item from excess profits net income. It is necessary that the item be found attributable under these regulations in whole or in part to other taxable years. Only that portion of the item which is found to be attributable to other years may be excluded from the gross income of the taxpayer for the year for which the excess profits tax is being computed.

Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin, and only in such amounts as are reasonable in the light of such events. To the extent that any items of net abnormal income in the taxable year are the result of high prices, low operating costs, or increased physical volume of sales due to increased demand for or decreased competition in the type of product sold by the taxpayer, such items shall not be attributed to other taxable years. Thus, no portion of an item is to be attributed to other years if such item is of a class of income which is in excess of 125 per cent of the average income of the same class for the four previous taxable years solely because of an improvement in business conditions. In attributing items of net abnormal income to other years, particular attention must be paid to changes in those years in the factors which determined the amount of such income, such as changes in prices, amount of production, and demand for the product. No portion of an item of net abnormal income is to be attributed to any previous year solely by reason of an investment by the taxpayer in assets, tangible or intangible, employed in or contributing to the production of such income. * * *

To be sure, a sizable portion of the corporation's increased income in 1942 and 1943 resulted from a greater demand for machine tools. This is readily discerned from the increases in orders received by petitioner and from the increased sales of machine tools in general. Some portion of the income of these classes, therefore, does not come within the meaning of the statute. *Eitel-McCullough, Inc.,* 9 T. C. 1132.

The facts that machine tool and diesel engine plants used petitioner's machines to manufacture products for defense work; that petitioner was granted a priority in obtaining materials in wartime; that petitioner made purchases of emergency facilities under certificates of necessity and amortized them under section 124, I. R. C., and that petitioner renegotiated excessive profits on war contracts, do not require the conclusion that all of petitioner's increased income resulted from wartime demand. These facts demonstrate that the petitioner corporation was engaged in work deemed vital to the war effort and that petitioner's machine tools were in demand. Participation in the defense program does not disqualify a corporation from the relief Congress intended to grant if the requisites for that relief are present and have been proved. In this case the petitioner has established the necessary requirements laid down by section 721 (a) (2) (C), I. R. C.

Respondent points out that during the war period the supply of machine tools never caught up with the demand. The petitioner's excess of orders over sales existed in large part because petitioner had created an improved product. Had its milling and boring machines been unable to compete with the machine tools of others, petitioner could not have attained the sales and profits accomplished with the "Ohio Dreadnaught" and "Ohio Production." This Court has not precluded other petitioners from relief because the product developed by research over a period of years was employed extensively in the war effort. *Keystone Brass Works, supra; Pantasote Leather Co.,* 12 T. C. 635.

The case of *Breeze Corporations, Inc.,* 16 T. C. 587, is distinguishable on the facts there involved from our decisions in *Keystone Brass Works* and *Pantasote Leather Co.,* both of which support the holding in the present case that we have not denied the application of section 721 (a) (2) (C) merely because the petitioner's products were used in the war effort. The *Breeze* case was concerned with the manufacture of antenna mounts used in radar equipment and armor plate used in aircraft. The research and development began in 1938 and 1939. The Court in the *Breeze* case pointed out that neither the *Keystone Brass* case, involving bushings for aircraft engines, nor the *Pantasote*

*Leather* case, concerning fabrics manufactured to meet Armed Services requirements, involved a secret development exclusively for the United States Government, such as antenna mounts. The demand for the products involved in the *Breeze* case was said to be created by the Government and the products could only be sold to the Government. The growing demand by the Government was the initial cause of the research in the *Breeze* case.

In the present case, the Ohio Machine Tool Company began its research and development in the early 1930's, and governmental demand was not the initiating factor as in the *Breeze* case. Machine tools such as those made by the petitioner have many and varied uses exclusive of wartime manufacture which is not true of armor plate and radar antenna mounts. As was true in the *Pantasote Leather* and *Keystone Brass* cases, the products manufactured had commercial sale uses other than by Government. Also, as was true in the *Pantasote Leather* case, the processes of research began in the early 1930's, unlike the situation in the *Breeze* case.

The respondent argues that the development of the improved boring and milling machines was merely the usual process carried on by every manufacturer in order to meet competition and thus does not meet the standards of development required by section 721 (a) (2) (C). The research and experiment that went into the development of the "Ohio Dreadnaught" extended over 11 years in all and cost over $14,900. The "Ohio Production" machine development and experimental work was carried on for a total of 5 years. The evolution of new and improved machines requiring this proportionate amount of research, time, and money cannot be classified as the usual process of industrial development. The new machines, though not unique, were considerably improved over previous types. The research and experiment necessary to achieve these results cannot here be disregarded as everyday practice.

The respondent makes another objection to the petitioner's claims. Although the petitioner has taken into consideration the effects of improved business conditions and the consequent increased demand for machine tools, it failed to attribute any net abnormal income to certain other elements in the production of this income. Such factors as management ability, effective salesmanship, good will, and efficient use of plant facilities and other physical assets in the manufacturing process played an important part in the increased sales, production, and profits of 1942 and 1943. Since no compensation has been made to offset the effects of these factors, it necessarily follows that some reduction must be made in petitioner's computation of the net abnormal income attributable to the development and research of prior

years. The Court has concluded that a sizable reduction is appropriate for this purpose. Accordingly, the Court has, upon consideration of all the facts, determined the net abnormal income which is attributable to prior years, giving proper regard to all the aforementioned factors. *Ramsey Accessories Manufacturing Corporation,* 10 T. C. 482; *Lindstedt-Hoffman Co.,* 11 T. C. 584; *Pantasote Leather Co., supra.* We believe this computation of net abnormal income attributable to the years of development and research fairly reflects the intendment of the statute.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*