L. E. CARPENTER & COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54678. Filed December 30, 1957.

*Jacquin D. Bierman, Esq., Edward Pesin, Esq.,* and *Mortimer Berl, Esq.,* for the petitioner.
*Stanley W. Herzfeld, Esq.,* for the respondent.

MULRONEY, *Judge:* This is a proceeding involving deficiencies asserted by the respondent and refunds claimed by the petitioner as follows:

| Year | Tax | Deficiency | Refund claimed |
|------|-----|-----------|----------------|
| 1942 | Excess profits | | [1] $242,596.76 |
| 1943 | Excess profits | | 94,342.34 |
| 1944 | { Income | $34,650.33 | |
|      | { Excess profits | | 47,395.67 |
| 1945 | Excess profits | 19,308.26 | 47,841.17 |

[1] The petitioner now concedes that $219,469.36 of its claimed refund for the taxable year 1942 is barred by the statute of limitations, leaving a claimed refund of $23,127.40 for 1942.

The sole issue presented for our determination is whether petitioner derived abnormal income during the taxable years 1942 through 1945 which can be attributed to its prewar research and development extending over a period of more than 12 months within the meaning of section 721 (a) (2) (C) of the Internal Revenue Code of 1939.

## FINDINGS OF FACT.

Some of the facts have been stipulated and are found accordingly.

L. E. Carpenter & Company, hereinafter referred to as the petitioner, was incorporated in New Jersey in 1925 and maintained its principal offices in Wharton, New Jersey. Its corporation income and excess profits tax returns for the period here involved were filed with the then collector of internal revenue, Newark, New Jersey.

Petitioner filed its excess profits tax return for 1942 on May 15, 1943. Payments were made thereon on the following dates and in the following amounts:

*1942*

| | |
|---|---|
| Mar. 15, 1943 | $79,770.00 |
| June 26, 1943 | 76,724.46 |
| Sept. 15, 1943 | 78,247.23 |
| Jan. 1, 1944 | 78,247.23 |
| Mar. 1, 1946 | 23,127.40 |
| Total | 336,116.32 |

On January 28, 1948, the petitioner filed a claim for relief under section 721, I. R. C. 1939, asking for a refund of excess profits tax in the amount of $242,596.76 paid for 1942. Petitioner now admits that such claim was not timely except insofar as it includes the March 1, 1946, payment of $23,127.40.

The petitioner filed timely claims for relief and refund under section 721 for the years 1943, 1944, and 1945. In the petition filed herein the petitioner claimed refunds in the amounts of $94,342.34, $47,395.67, and $47,841.17 for the years 1943 through 1945, respectively, which claims were disallowed in full by the respondent.

The petitioner began its operations in 1925 as a manufacturer of what is commonly called imitation leather. The essential nature of the operation was to lay successive coats of a pyroxylin solution on top of a fabric base with as little penetration as possible to reach a desired thickness. The machine used in this operation to coat the fabric was a standard-type coating machine. The principal user of petitioner's product was the bookbinding trade which used it as book cloth.

The Holliston Mills, Inc., hereinafter referred to as Holliston, was a major manufacturer of a starch-filled water-soluble book cloth and also acted as distributors of petitioner's product to the bookbinding industry. On February 1, 1932, petitioner and Holliston entered into a contract by which petitioner sold to Holliston that part of its business consisting of the manufacture and sale of pyroxylin-coated fabrics for the bookbinding and window shade trades. By this contract petitioner transferred machinery and equipment to Holliston for two complete coating units and agreed to furnish the pyroxylin

solution for the successful production of "Sturdite," the trade name of petitioner's product.

The contract provided that petitioner would not manufacture or sell pyroxylin-coated fabrics to the bookbinding or window shade trade for 5 years and that for the same period Holliston would produce such fabrics only for such trade. The agreement also provided that L. E. Carpenter, who was one of petitioner's incorporators and will hereinafter be referred to as Carpenter, would work for Holliston for 1 year. He was to devote his efforts "to directing, supervising and assisting in the work of installing the necessary machinery as aforesaid, the attainment of successful commercial production of the Sturdite bookbinding and shade cloth products in said Norwood and the development of a new type or types of fabric now contemplated by the parties hereto as may be necessary to those ends." The new fabric mentioned was a pyroxylin-impregnated book cloth which at least two other companies had been producing commercially since 1930 or early 1931.

One of petitioner's foremen, Levi B. Cushman, was sent by petitioner to help install the machinery and get production started at Holliston. Petitioner had not, prior to this time, commercially produced an impregnated fabric. Within 2 or 3 months, with the help of Carpenter and Cushman, Holliston produced a commercially acceptable pyroxylin-impregnated fabric.

A coated fabric such as Sturdite is obtained by laying a continuous film of solution on top of the fabric. An impregnated fabric is obtained by driving the compound or solution into the fibers of the fabric by the use of pressure blades or doctor knives. There are two principal methods of applying the solution. The "puddle method" called for a puddle of solution to be applied separately to each side of the fabric in front of the blades which forced the solution into the fabric, one side at a time. Another method was the so-called bath method whereby the fabric passed through a solution-filled trough after which the solution would be driven into both sides of the fabric in the same operation by the pressure exerted by the doctor knives. The puddle method was superior for book cloth production as only one side of the fabric was impregnated. The bath method was superior for impregnating duck fabric to be used by the Army for tent purposes as thorough impregnation was required.

The basic components of the solution or compound, commonly referred to as dope, which is used to coat or impregnate fabric to gain certain characteristics, are essentially the same as in paint or any other coating material. They are (1) a film former or binder, which binds together the other components of the solution; (2) a

plasticizer, which lends pliability to the treated fabric; (3) pigments, which color the fabric; and (4) solvents, which regulate the viscosity of the compound. The formula and nature of the chemicals used in making up these components determine the characteristics of the fabric as to flameproofness, weather resistance, pliability, etc.

Petitioner's principal business after the sale to Holliston was the manufacture and sale of artificial leather or pyroxylin-coated fabrics other than book cloth. Most of these fabrics were treated with a solution containing nitrocellulose which is highly inflammable. In 1935 petitioner was released from its agreement not to deal in the bookbinding and window shade trade and reentered that business, producing pyroxylin-impregnated book cloth.

In mid-1941, petitioner learned that the Government was seeking processors who could render duck flameproof, waterproof, and weatherproof for tent purposes. Petitioner decided that it could qualify as a processor, presented an acceptable sample of treated duck, and thereafter received its first Government order for processing duck in 1941. From that date through the taxable years before us petitioner devoted most of its time and equipment to the production of treated duck for the Government. Prior to 1941 petitioner had never attempted to produce any fabric treated to the specifications required by the Government.

Because petitioner had been approved as a processor of duck, petitioner was asked to bring in other companies which could be converted to produce the treated fabric. In March 1942 petitioner entered into contracts with Holliston, Weymouth Art Leather Company, Suntex, Inc., and Coated Textiles, Inc. Under the contracts petitioner was required to give the other companies full information as to chemical formulation of the solution which was to be used to meet the Army specifications. Petitioner was also obligated to instruct these companies as to methods of application and the procurement of raw materials.

The machinery used by petitioner was not developed by petitioner but was in common usage prior to the existence of petitioner. Standard coating machines were used not only for coating fabrics but for impregnating fabrics after certain adjustments were made. These adjustments required manipulative skills which could be made on the foreman level in a shop and compared technically with the adjustments made by a lathe operator. Petitioner was not the first to convert a standard coating machine to one used in impregnating fabrics.

The bath method of impregnating fabric was not developed by petitioner. This method is very old and is generally used in the dyeing industry and waterproofing industry. Petitioner began its

Army duck operation using the standard coating machine with a coating head to impregnate the duck. The method was determined to be unsatisfactory as to waterproofness and in December 1942, petitioner suggested to Holliston and to petitioner's other subcontractors that they adopt the bath method of impregnation which was being used by one of petitioner's subcontractors, Weymouth Art Leather Company, hereinafter referred to as Weymouth. Thereafter the bath method of impregnating fabric was used.

The chemical formula for flameproofing wartime duck and that used for producing pyroxylin-coated or -impregnated book cloth are fundamentally different formulas for fundamentally different products, even though both contain (1) a film binder or former, (2) a plasticizer or softener, (3) a pigment, and (4) a solvent. Prior to 1941 only three firms were commercially producing flameproof fabrics. Flameproofing was a comparatively new process and petitioner had never commercially produced such goods prior to 1941.

In 1938 Gustave E. Landt, a pioneer in the field of flameproofing fabrics, developed, after years of work, the most effective flameproofing combination of elements known. This solution contained a combination of antimony oxide and chlorinated hydrocarbons. Calcium carbonate was also a vital ingredient in this formula. This combination satisfied the required specifications of the Army duck program during the taxable years. Prior to 1941 petitioner had never used antimony oxide in combination with a chlorinated hydrocarbon but did use this formula in producing treated duck for the Army tent program during the taxable years. By the end of 1941 most companies attempting to flameproof fabrics were using the combination of agents developed by Landt.

Most of petitioner's products prior to 1941 were coated or impregnated with a nitrocellulose solution which is highly inflammable. Efforts were made on some of these products to make them fire resistant by adding such flameproofing agents as tricresol phosphate and boric acid. The use of nitrocellulose in a solution defeats the purpose of adding a flameproofing agent.

None of the flameproofing agents used by petitioner prior to 1941 and none of the fireproofing agents known in the early 1930's was used as such an agent in Army tent production during the war. These agents were not used because they were too water soluble or they would not give the extended resistance to wear and tear that was required.

The chlorinated hydrocarbon used with antimony oxide was changed several times during wartime production because of scarcities. Each time a change was made, new proportions of antimony oxide to chlorinate hydrocarbons had to be worked out to achieve the same

results. Eight or ten changes in formula were made by petitioner during the years in question and each change required a period of experimentation and testing.

No part of petitioner's income during the years 1942 through 1945 resulted from exploration, discovery, prospecting, research, or development by petitioner of tangible property, patents, formulas, or processes, or any combination of the foregoing extending over a period of more than 12 months.

OPINION.

Petitioner has filed a claim for refund of excess profits tax under the provisions of section 721, I. R. C. 1939.[1] The issue before us is to determine whether or not petitioner received net abnormal income in the years before us which is attributable to prior years within the meaning of the cited sections of the Internal Revenue Code of 1939.

The petitioner contends that it did receive such income of the class set out in section 721 (a) (2) (C), I. R. C. 1939, which is set out in the margin. This income, petitioner asserts, resulted from its research and development in the field of fabric impregnation over a period extending from 1927 through 1939. The respondent, on the other hand, contends that no part of the tremendous income received by petitioner in the years before us resulted from any research or development carried on by the petitioner. Upon the record presented, we agree with the respondent.

[1] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, or, if the taxpayer was not in existence for four previous taxable years, the taxable years during which the taxpayer was in existence.

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income :

\*    \*    \*    \*    \*    \*    \*

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months ; or

\*    \*    \*    \*    \*    \*    \*

(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

The petitioner, since its incorporation in 1925, has been in the business of treating fabrics with chemical solutions to achieve certain desired characteristics. The principal product of petitioner in the beginning was a coated fabric commonly known as imitation leather. Petitioner's principal market for the product was the bookbinding trade. At first petitioner coated the fabric with the solution, laying a film of the solution on top of the fabric. Later petitioner saturated or impregnated the fabric with the solution. Impregnation was achieved by two methods, i. e., the puddle method, whereby only one side of the fabric was treated at a time, and the trough method, whereby the fabric was immersed in the solution and impregnated through and through by the pressure applied by knives, bars, or rollers to each side of the fabric. The puddle method was best for book cloth as only one side of the fabric was impregnated. The bath method was superior for the duck program as more thorough saturation was necessary for waterproofing purposes. Both methods were well known in the trade.

The machines used by petitioner for both coating and impregnation and for both book cloth and Army duck, were standard coating machines. The machines required some modifications when used for impregnating fabrics.

The solution used by petitioner generally in its book cloth production was a pyroxylin formulation which contains nitrocellulose, a highly inflammable agent. Generally the principal agents of the solution used for the duck program were chlorinated hydrocarbons, antimony oxide, and calcium carbonate.

There is no argument but that the great profits of petitioner were derived for the most part from the processing of a fabric known as duck for the Armed Forces. The petitioner's efforts were devoted toward the impregnation of the duck with a chemical compound or solution so as to render the fabric flameproof, waterproof, and generally weather resistant so that it might be suitable for tent purposes.

Petitioner's argument is not that its research and development were carried on over the years looking to the production of flameproof, waterproof, etc., duck, the product from which its profits were derived. Its argument is that because of its research and development in the fabric impregnation field in general and its development of an impregnation process, it was able efficiently and quickly to produce the required duck for the Armed Forces. Petitioner's problem therefore is to prove that its research and development in the fabric impregnation field extending over a period exceeding 12 months so affected its production of treated duck that its increase in income during the years before us, at least in part, can be attributed to that research and development.

Petitioner contends that it developed, through its own research and development, the process, which includes the machinery, the formulation, and the technique for impregnating fabric of all types, including duck, to meet required specifications. We do not think that the record supports the contention.

Let us first consider the machinery used by the petitioner. It. is admitted by petitioner that none of the coating machines used were invented by petitioner. The machines used from the beginning were standard coating machines which had been in use long before petitioner was incorporated. There was evidence that the machines were in use as far back as 1915.

What petitioner does contend is that the modifications necessary to be made on the standard coating machine to convert it from a coating machine to an impregnating machine were developed by petitioner. While petitioner's witness, L. E. Carpenter, one of petitioner's incorporators and present chairman of the board, made this contention in his direct testimony, he seemed to admit on cross-examination that petitioner did not develop the modifications. He testified that the major changes necessary to be made in converting the machines were: Altering the sharpness and angle of the knives which are used to drive the compound into the fabric, and altering the speed and tension at which the fabric is passed through the machine. Carpenter then admitted that petitioner was not the originator of the changes made in the angle of knives, sharpness of knives, tension and speed of fabric passed through the machine.

There was also evidence that the changes described by Carpenter were made, usually on the foreman level, in the shops. Gustave E. Landt testified that a degree of manipulative skill similar to that of a lathe operator was necessary to make the adjustments on the standard coating machine, and that scientific knowledge was not necessary.

There is also evidence in the record to the effect that if these modifications were developed by anyone connected with petitioner, the development came while these employees were working for Holliston and did not extend over a period exceeding a year as required by the statute. The sales agreement between petitioner and Holliston not only provided for the sale of *coating* machines and a pyroxylin-*coating* process, but provided that L. E. Carpenter would work for Holliston and devote himself, among other things, to the "development of a new type or types of fabric now contemplated by the parties." It is obvious from the record that the new fabric contemplated, but yet to be commercially developed, was a pyroxylin-*impregnated* book cloth.

Levi B. Cushman, an employee of petitioner from 1925 to 1932, was sent to Holliston by petitioner in 1932 as a foreman to aid in the

installation of machinery and getting production started. He testified that petitioner had never commercially produced an impregnated fabric prior to the sale to Holliston and that such a fabric was developed at Holliston and commercially produced, using the puddle method of application, within 2 or 3 months after the sale. It thus appears that the modifications made on the standard coating machines may have been developed by Holliston, if at all, within a few months in 1932. In any event, petitioner has not proven that it, by its own research and development, developed any of the machinery used in the impregnation of duck for the Armed Forces.

Petitioner contends that it developed the bath method or technique of impregnation. The fact is that petitioner's own witness, Thomas D. Lewis, stated that the bath method of immersing fabric and the use of knives or bars to impregnate fabric was as old as "Omar and the first beeswax." L. E. Carpenter stated that he developed the bath process on June 10, 1932. On this date Carpenter was supposed to be under contract to Holliston, devoting time and effort toward the development of a new type (impregnated) fabric. Also on this date Carpenter wrote a letter to Holliston in which he related the fact that he had run an experiment at a firm by the name of Goodlatte's, using their saturating machine. A rough sketch of Goodlatte's saturating machine, which employed the bath method, was enclosed.

First of all, if Carpenter developed the bath method or process of impregnation to any extent at all, it is not clear whether he did so while working for petitioner or for Holliston. Second, if he developed the process on or prior to June 10, 1932, we wonder why he found it necessary to run experiments, obviously for Holliston, on a bath assembly of another firm. We also wonder why Carpenter enclosed a sketch of Goodlatte's saturating machine when petitioner had allegedly already developed such a machine.

Another oddity in petitioner's evidence is that, although petitioner contended that it developed the bath method of impregnation and determined that such method was superior to the puddle method, the petitioner began the duck program using the puddle method instead of the bath process. From the allegations made in petitioner's claim for relief and memorandum of additional information, one would gather that only the bath method of impregnation was used in the duck program. On trial it was disclosed that as late as December 1942 petitioner was using the puddle method and only changed to the bath method when complaints of poor impregnation were received. Petitioner then recommended that its subcontractors adopt a bath assembly process, not the bath assembly that petitioner had allegedly developed, but an assembly already in use by one of petitioner's subcontractors.

We think all this evidence strongly indicates that petitioner did not, through its own research, develop the bath method of impregnating fabrics which was used during most of the years before us for the production of duck. There can be little doubt that petitioner had an experienced, efficient book cloth impregnating plant by 1941. No doubt its personnel were well qualified and skilled in the art of coating and impregnating book cloth. We think, however, that petitioner has mistaken such skill and efficiency for research and development. Just because petitioner had the personnel skills and the machinery which could be converted to the efficient production of duck does not necessarily mean that petitioner had developed anything within the meaning of section 721 (a) (2) (C), I. R. C. 1939.

We come now to petitioner's contention as to the development of the formulation used in the duck program. Petitioner did not originally contend in its refund claim and memorandum of additional information, that the chemical formula used in the duck program was a result of its research and development in the flameproofing field. There, as we have stated, petitioner's principal claim of development was a "process" of impregnating fabrics by immersing the fabric in a bath and forcing the solution into the fabric with knives. It was only at the trial of this case that petitioner attempted to prove some connection between the fireproofing formula used in the duck program and its research.

We think that petitioner has failed to prove that its independent research and development in chemical formulations effected any increase in petitioner's income in the years before us. The most important elements in the formula approved by the Armed Forces and used for the duck program were antimony oxide, a chlorinated hydrocarbon, and calcium carbonate. We have found as a fact that petitioner, prior to 1941, had never used these elements together. In fact, petitioner did not attempt to prove that it, prior to 1941, had even experimented with these elements.

Petitioner's chemical development argument therefore is not directed toward the particular, specific formula used in the duck program. The argument is that because of its development of chemical formulation to achieve given characteristics, in general, that it could and did come up with this particular formula within 2 weeks after receiving the specifications.

In the light of the testimony of Gustave E. Landt, an eminent personality in the field of chemical research, especially in the flameproofing field, the argument by petitioner appears doubtful. Landt testified that the chemical formulas used by petitioner prior to 1941 and the formula used in the duck program were fundamentally different, even though both of these formulas and all coating-type

solutions contain a film former or coater, a plasticizer, a pigment, and a solvent. Landt further testified that he developed the use of antimony oxide, in combination with the other elements mentioned, in 1938 after about 5 years of intensive research. We simply do not believe that petitioner could have come up with the same formula within 2 weeks as a result of its general research and development in pyroxylin impregnation of book cloth prior to 1941.

We think that petitioner was selected as a processor of duck for the Armed Forces, not because it had developed anything, but because it had the machinery, experience, and skill in the impregnation field which could be easily converted to the wartime program. There were only three firms which were in the flameproofing field prior to 1941 and petitioner was not one of them. Waterproofing firms were chosen, leather firms were chosen, along with book cloth firms, not because these firms had developed machinery, formulas, or anthing else. They were chosen because they could convert to the production of impregnated duck with the least amount of confusion.

Because petitioner was skilled in the field and got in the duck program early, the Government asked petitioner, as a prime contractor, to bring in other firms. Petitioner brought in several firms which began as subcontractors under petitioner and which paid petitioner a certain amount per yard of fabric treated for the Government. At the trial of this case, petitioner argued that these firms were licensees and the sums paid were royalties for the use of petitioner's formulation or process which, of course, it had developed. This argument is directly contradictory to contentions made by petitioner to officials of the Quartermaster Corps when petitioner's dealings with its subcontractors came under examination for possible renegotiation under the Royalty Adjustment Act of 1942. At that time petitioner contended that the payments it received were not royalties for the use of an exclusive process but were payments largely for technical services rendered.

It is not necessary for us to determine whether or not the payments received from firms such as Holliston and Weymouth were royalties for the use of a process or were fees for technical services, as we have already determined that petitioner did not develop the machinery, the formula, nor the technique for processing duck. We might state in passing, however, that we fail to understand what "process" Holliston would have been licensing from petitioner. Petitioner had, in 1932, sold Holliston machines and had sent Levi Cushman and L. E. Carpenter to work with Holliston to install the impregnation process at Holliston. As far as we know, Holliston had the same machinery and skills for impregnating fabric as did petitioner in the years before us. The only thing Holliston would have needed to license from

petitioner would have been the flameproof formula, which petitioner developed in 2 weeks, if at all.

Certainly Weymouth would not have found it necessary to license the bath method of saturating fabric from petitioner as petitioner in 1942 suggested that other contractors adopt the bath method already in use by Weymouth.

Since our problem here is completely factual, it would be useless to cite authorities as we have found no case with similar facts. *Pantasote Leather Co.*, 12 T. C. 635, which petitioner cites as having "virtually identical circumstances," is no aid to us. In that case it seemed to be agreed that the taxpayer had spent many years developing the very product which brought in the agreed abnormal income. The only issue in the case was whether the abnormal income was attributable to that development of prior years, or to other criteria in the years in which the income was received. Here we have determined that the research and development of petitioner, if any, in producing pyroxylin book cloth had no bearing on its wartime income from flameproof, waterproof, and weather-resistant duck for the Armed Forces.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*