SOABAR COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 1730.    Promulgated June 12, 1946.

*Sanford D. Beecher, Esq.*, for the petitioner.
*William D. Harris, Esq.*, for the respondent.

OPINION.

MURDOCK, *Judge*: Section 23 (a) (1) (A) of the Internal Revenue Code allows a deduction of "a reasonable allowance for salaries or other compensation for personal services actually rendered." The Commissioner has disallowed part of the compensation of two of the petitioner's officers for the years 1939 to 1941, inclusive, upon the ground that the amounts paid were "excessive." The respondent's main contention in his briefs seems to be that the arrangement for compensation of these two men was a plan devised and resorted to in connection with the dividends to divide the profits of the business in approximately equal shares. The compensation in question was duly authorized, incurred, and paid. It did not constitute dividends in disguise. Indeed, it did not bear any relation to stockholdings. These two officers were primarily responsible for the success of the company. Henry devoted all of his time to the business of the company and, although he was the smaller stockholder, his compensation was the larger. His bonus was based upon dividends paid and, of course, increased a great deal with the large earnings of 1941. However, it had been bargained for and agreed to and it was reasonable in the light of his past services and increased duties and responsibilities of the taxable year. Robinson's salary was fixed in amount and was not large in relation to that of Henry. Although he did not give as much of his time to the business of the petitioner as did Henry, he nevertheless did render very valuable services and did devote a sufficient part of his time to the business of the petitioner to justify the salary paid him. We have found as a fact that the compensation paid to each was reasonable within the meaning of section 23 (a) (1) (A).

The second assignment of error is that the Commissioner, in determining the deficiencies in excess profits taxes for the years 1940 and

1941, has failed to apply properly the provisions of section 721 in regard to abnormalities in income. The petitioner's first contention under this assignment is that it had abnormal income within the definition of 721 (a) (2) (C), resulting from the development of patents and processes, and it had net abnormal income of this class in 1940 and 1941, all of which should be allocated to prior years. The evidence shows that the petitioner in prior years had developed various patents and had also developed some machines for which no patents have been obtained. It regards the development of these unpatented machines as the development of secret processes. Section 721 (a) (2) (C) provides that income resulting from the development of patents or processes extending over a period of more than twelve months is a separate class of income. The petitioner has never granted any licenses under any of its patents and has not permitted anyone to use any of its secret processes. There is no income segregated on its books as income resulting from the development of patents or processes. It called witnesses who gave their opinion as to what would have been a fair royalty during the base and tax years for the exclusive license, first, to manufacture and sell ticketing and marking machines under all of the petitioner's patents, and, second, to manufacture and sell tickets under the petitioner's patents and secret processes for the manufacture of tickets, assuming that the processes had been patented and that no patent had expired. These witnesses expressed their opinions in terms of percentages of whatever gross sales the imaginary licensee would have had, first, of the machines, and, second, of the tickets. The petitioner apparently assumes that any exclusive licensee would have done the same business that the petitioner actually did, i. e., it applies the percentages given by the witnesses to its own gross sales for the base years and the tax years in order to determine the amount of its abnormal income of this class during each of those years.

Section 721 (a) (3) provides that net abnormal income of each tax year means the abnormal income of that year, less 125 per cent of the average amount of the gross income of the same class for the four previous years, and less also an amount representing a prorated part of the cost or expenses of the tax year expended in deriving the abnormal income of the tax year. The evidence shows that the petitioner made no outlay in either 1940 or 1941 for the development or further development of any of its patents or processes. The petitioner, therefore, concludes that its net abnormal income for each tax year is simply the abnormal income of that year, less 125 per cent of the average income of the same class for the four preceding years. 721 (b) provides for attributing a part or all of the net abnormal income of a tax year to other years. The elimination from the income of the tax years of all or a portion of the net abnormal income of those years

is the ultimate goal of the petitioner. 721 (b) provides that the amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regu lations prescribed by the Commissioner with the approval of the Secretary. The petitioner contends that all of its net abnormal income of this class for 1940 and 1941 should be attributed to earlier years, that is, to years in which the development of the patents and processes occurred and expenditures were made for the development. The petitioner has not shown just when the patents and processes were developed, and it has not shown what expenditures, if any, it made in developing its patents and processes. But it argues that such evidence is unnecessary, since it appears that this development took place prior to 1940, when the excess profits tax was first imposed under subchapter E. The statement in this and the preceding paragraph sets forth the main structure of the petitioner's argument on this point.

The petitioner makes its claim for relief under 721 for the first time in its petition in this proceeding. It did not make such a claim to the Commissioner and he did not consider or reject such a claim in determining the deficiency. The petitioner must thus build its claim step by step from the very beginning.

It seems obvious that some of the income of the petitioner for each of the base years and for each of the tax years was of the class described in 721 (a) (2) (C) in that it resulted from the development of patents and processes in prior years. The petitioner had the right and the duty to demonstrate in some way what the amount of that class of income was in each of those six years. Once the amount of the income of this class for the two tax years and for the base years is shown, then the abnormal amount for the tax years is merely a matter of mathematics under 721 (a) (1). It would be no further problem to determine net abnormal income for the tax years if, as the petitioner argues, and as the respondent does not deny, there are no direct costs or expenses of the tax years to complicate the matter. The final step would be to determine the amount, if any, of this net abnormal income for the tax years which should be attributed to prior years under regulations prescribed by the Commissioner with the approval of the Secretary. Sec. 721 (b).

We shall pass various questions which have arisen or might arise in this case, including the question of how much, if any, of the income in question would not fall in class (C) because it resulted from the early Davis patent which was not developed by the petitioner but was developed prior to the organization of the petitioner; the question whether the development of any of the petitioner's patents or processes extended over a period of more than twelve months; the question whether the petitioner erred in directing its witnesses to assume that all of its

machines and tags were manufactured under existing patents when, as a matter of fact, some of the patents had expired and some of the so-called processes were not covered by any patent; the question whether the percentage royalties which these witnesses described could be applied to the actual gross sales of the petitioner, which gross sales, the respondent objects, must be attributed in large part to the going business or good will established by the petitioner over a long period of operations and may not be assumed for the benefit of an imaginary licensee; and the question whether any part of the net abnormal income of the tax years could be attributed to earlier years in which the patents were developed, in view of the fact that the petitioner has not introduced evidence shedding any light on the events of those years or upon the expenditures, if any, made in those years in developing the patents and processes. The parties, as the petitioner describes it, meet "head-on" when they come to the question of the validity and application of section 30.721-3 of Regulations 109, and we prefer to decide the case on this broad and important point rather than upon any of the other questions just mentioned.

Section 30.721-3 provides, *inter alia,* that net abnormal income of a tax year shall not be attributed to other years to the extent that it is the result of increased physical volume of sales due to increased demand for the product. That is, no portion of net abnormal income of a tax year is to be attributed to other years where the excess of the income of this class for the tax year over 125 per cent of the average of this class for the four previous years was due solely to an improvement in business conditions. The respondent contends that the entire increase in this class of income in the tax years over the average for the base years was due solely to improvement in business conditions and was the result of increased physical volume of sales due to increased demand. The petitioner contends that the regulation is unlawful in so far as it attempts to apply this improved business test to income of the (C) class, and it further contends that, even though there was an improvement in business and an increased demand for the petitioner's products, resulting in a larger volume of sales during the tax years, nevertheless, the same percentage of the gross sales of those years is the result of the development of patents and processes as in the base years.

Consideration should be given at this point to the broad purposes which Congress intended to accomplish by the enactment of the excess profits tax provisions. The legislative history of the Second Revenue Act of 1940 and of the Excess Profits Tax Amendments of 1941 shows that the two major purposes of the provisions were, first, to provide additional revenue urgently needed to help meet the costs of national defense program and, second, to prevent the rearmament program from furnishing an opportunity for the creation of new war

millionaires or the further substantial enrichment of already wealthy persons. The tax was to apply to corporate profits from all sources, except that every reasonable precaution was to be taken to prevent unfair application of the tax in abnormal cases. See House Rept. No. 146, 77th Cong. (1941–1 C. B. 550), and House Rept. No. 2894, 76th Cong. (1940–2 C. B. 496). It is seen from this history and from the provisions of the act that the profits of a taxpayer for the base period years were to be regarded as normal in most cases and the tax was to be applied, generally, to the excess of the profits of the tax year over the prior normal profits. Congress anticipated that business for many taxpayers would improve because of external changes and it intended the tax to apply in those cases. It also realized that there might be some instances in which the income of the base period years might not satisfactorily reflect internal changes in the business. That is, there might be cases in which the increase in profits of the tax year over those of the base years might be attributed, at least in part, to internal changes and development of a particular business or some phase of that business to its full stature and to that extent would not be attributable to the outside business stimulus. Congress indicated in the provisions of the law some of the instances or indicated to some degree some of the situations which it deemed abnormal, but it left a great deal to the administration of the Commissioner of Internal Revenue. It directed him to prescribe regulations to carry into effect many of the provisions of the law and to implement those provisions. The regulation here under attack is one of those regulations, and the question is whether it carries out the intent and purpose of Congress or tends to frustrate the accomplishment of results which Congress intended.

The officers of the petitioner, by combining the use of patents, processes, capital (including the plant and equipment), labor, technical skills of employees, salesmanship, managerial ability, and perhaps other factors, had conducted the business successfully for many years. This continued success would indicate that the business was not static, but that some changes and improvements were made to keep it abreast of any new advances in its field. However, that business, including the use of the patents and processes, had long been fully developed and had undergone no material change for at least four years prior to 1940 and 1941. The normal operation of the business involved the use of whatever patents and processes it had.

The class (C) net abnormal income of 1940 and 1941 represented an increase in this class of income over that received in the base years. That is what net abnormal income means in a case like this. The increase in these profits in the tax years over the base years was not brought about by any internal change in the petitioner's business, by

a change in the use or development of its old patents or processes, by any natural growth in their development, or by the introduction into its business of any new patents or processes. No patents or processes were developed during those six years. Nothing inherent in the business brought about the change. This record indicates that, if there had not been an improvement in business and a consequent increase in the demand for the petitioner's products, due, apparently, to the advent of war, the petitioner would not have had any net abnormal income in 1940 and 1941. The petitioner, having a fully developed business, was able to take advantage of a greater demand for its regular line of products, which greater demand resulted from sources outside the petitioner's business. Its greater profits in the tax years came to it because of improved business conditions, stimulated, apparently, by the prospect that the war then raging would or might soon involve this country. Congress intended the excess profits tax to apply to such increased or excess profits. See House Rept. No. 146, p. 9, 77th Cong., 1st sess. (1941–1 C. B. 557). The regulation which the Commissioner prescribed, with the approval of the Secretary, carries out this intent by providing that such part of the net abnormal income of a tax year which was due to improved business conditions, resulting in a greater demand for the taxpayer's products, should not be allocated to any other years. It carries out the intent of Congress and is in harmony with the spirit and purpose of the provisions, as well as the wording thereof.

A case could be imagined in which the business normally to be expected from new patents or processes was still in the development stage in 1940 and 1941, so that a part of the increased profits of those years was not due to an increased demand resulting from war stimulated business, but was merely the realization in those years of growth (increase in profits) that would have occurred under normal conditions if there had been no war. A part of such an increase, that is, a part of the net abnormal income of the tax years, properly could be allocated to the earlier years in which the development of the patents or processes occurred and was paid for, but this is not such a case. Cf. *W. B. Knight Machinery Co.*, 6 T. C. 519. Here, no part of the increased or excessive profits of 1940 and 1941 was due to the development of patents or processes in recent years. All of the net abnormal income of the tax years was due to improved business conditions in the tax years which resulted in a greater demand for the petitioner's products in those years. Thus, even if the petitioner had made a case showing the exact amount of its net abnormal income of class (C) for 1940 and 1941, nevertheless, it would not be entitled to any relief under section 721, because no part of that net abnormal income properly could be attributed to any other year.

The petitioner's next contention is that it had income in the tax years derived from the sale of tickets and labels in these years made possible by the sale in prior years of machines in which these tickets and labels were to be used. It then contends that this is a special class of income other than that defined in subparagraphs (A) to (F), inclusive, of section 721 (a) (2) and the net abnormal income of this class for the tax years should be allocated to the earlier years in which the machines were sold. Our answer to this contention of the petitioner is substantially the same as that given above to its claim under section 721 (a) (2) (C). It is that, even if the net abnormal income of this class for the tax years were satisfactorily disclosed in this record, nevertheless, no part of that income could be allocated to any prior years because all of the net abnormal income of that class for the tax years was due to improved business conditions which resulted in a greater demand for the petitioner's products in those years.

Reviewed as to section 721 (a) (2) (C) by the Special Division.

*Decision will be entered under Rule 50.*