*Decision will be entered under Rule 50.*

H. S. McCLELLAND, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 15558. Promulgated January 19, 1950.

F. T. Ritter, C. P. A., for the petitioner.
H. A. Melville, Esq., and John D. Kiley, Esq., for the respondent.

48

OPINION.

JOHNSON, *Judge*: Admitting error in its reliance on section 734, Internal Revenue Code, on the tax return for the fiscal year 1941, petitioner now invokes section 721 as support for elimination from its excess profits income of the $11,021.87, contending that this amount was abnormal and attributable to other years.   Section 721, a relief

provision, limits the tax on abnormal income to the amount of additional tax which would have been due if the parts of such income attributable to other years had been added to the incomes of those respective years.

By subsection (a) (1) of section 721:

* * * The term "abnormal income" means income of any class * * * if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years * * *.

In subsection (a) (2) several classes of income are described, among them:

(C) Income resulting from * * * research, or development of * * * patents, formulae, or processes * * *, extending over a period of more than 12 months; * * *

While the classes described are not exclusive of others which may be recognized as reasonable under the Commissioner's regulations, sec. 35.721–2, Regulations 112; *Eitel-McCullough, Inc.*, 9 T. C. 1132; *Premier Products Co.*, 2 T. C. 445, the taxpayer's election of a class is irrevocable, section 721 (a) (2), and the Commissioner requires that a taxpayer claiming the relief benefits shall file with its excess profits tax return a detailed statement in duplicate regarding the amounts and classes of income which it deems abnormal, sec. 35.721–3, Regulations 112.

As petitioner failed to file such a statement or even to refer to section 721 on its return for the fiscal year 1941, respondent argues that the omission is fatal to its right to any relief otherwise available, especially since no class of income has been specified in the pleadings and briefs now before the Court. In *Soabar Co.*, 7 T. C. 89, we recognized a taxpayer's right to make its relief claim under section 721 for the first time in its petition to this Court, and while no "class" of abnormal income is expressly specified here, it is patent from the argument and evidence that petitioner deems its income from the Wheeler contract to be in part abnormal because resulting from the development of patents for grille and air control devices. Being a relief provision, section 721 is to be sympathetically applied, *Ramsey Accessories Manufacturing Corporation*, 10 T. C. 482, and we shall consider the claim here in issue on its merits.

There is no dispute that the $22,050.90, which petitioner received as its share of Controlair profits in fiscal 1941 exceeded 125 per cent of the average amount of its shares for the four base period years by $11,021.87. Hence its income from Controlair was abnormal in this amount under the definition of section 721 (a) (1), and, since Controlair was operated as a separate business, we consider petitioner's

income from this source as a "class" within the meaning of subsection (a) (2). Cf. *Arrow-Hart & Hegeman Electric Co.*, 7 T. C. 1350. But it is not enough that the class of income was abnormal. Petitioner must also establish that all or part of it was attributable to other years and must offer a factual basis for the proper allocation of such part among years of the base period to which it was attributable. Otherwise, section 721 affords no relief. Sec. 35.721-3, Regulations 112; *Steel or Bronze Piston Ring Corporation*, 13 T. C. 636; *Harris Hardwood Co.*, 8 T. C. 874; *Geyer, Cornell & Newell, Inc.*, 6 T. C. 96.

In its brief petitioner reasons that the evidence "plainly shows" that it, "in conjunction with Mr. Wheeler, developed grilles of new type and principle during the base period years" and that "the fruition of these efforts" first became substantial in the fiscal year 1941. It argues that, as costs of labor and material were relatively constant and there was small fluctuation in the estimated value of construction work for which building permits were issued in the Los Angeles area, its abnormal income from Controlair for the fiscal year 1941 should be attributed to development work during the base period, and that "it is not necessary to allocate the abnormal income to any particular year." It relies on *W. B. Knight Machinery Co.*, 6 T. C. 519, as supporting its contention. We therein held the taxpayer entitled to relief under the view that part of the abnormal profits from the sale of a new machine which it had developed by large experimental expenditures during 1936–1940 and which was not commercially successful until 1940, should be attributed to the years of experiment. The amount of profit attributed to each prior year was proportionate to the experimental expenditure of that year.

In the record of this proceeding petitioner, in our opinion, has failed to provide any adequate factual basis for an application of the principles followed in *W. B. Knight Machinery Co., supra.* McClelland allowed Wheeler the free use of space for experimental work in the fall of 1935. In his own words, he wanted Wheeler "to work out some designs of grilles and to see whether he could really form a business or not." Petitioner was not organized until May 1, 1936. It was then that the contract with Wheeler was made, and, so far as the record shows, the experimental work on the successful grille may have been already completed. Controlair's gross receipts for the fiscal year 1937 were $15,299.20; the adjustable bar grille accounted for 80 per cent or more of Controlair's sales, and McClelland testified that manufacture of the grille began in 1937. He did not testify as to when development work on it began or was completed, and nothing in the record is inconsistent with the possibility that all development work had been done when petitioner acquired by contract an interest in it. Abnormal income may not be attributed to a previous year by

reason of the taxpayer's investment in an asset, sec. 35.721-3, Regulations 112; *Premier Products Co., supra,* or, *a fortiori,* by reason of an acquisition without investment. The record, moreover, affirmatively excludes the possibility that development work extended over a period of more than twelve months, a condition essential to the application of section 721 (a) (2) (C), for manufacture of the grille began in the first year of petitioner's existence.

Petitioner has, therefore, failed to establish that any part of its abnormal income of fiscal 1941 resulted from research or development work extending over a period of more than twelve months or that a part of such income should be attributed to prior years for any other reason. While this conclusion makes it unnecessary to pass upon the adequacy of the record to support other facts essential to petitioner's claim for relief, we would point out, nonetheless, that no basis has been laid for attributing some specific part of income to the two patented products. Petitioner made no cash disbursements at all. Wheeler apparently did all the work, and Controlair's development cost is stipulated to have been nominal. The only item expressly mentioned is an estimated $350 in fees incurred by Controlair in 1938 in procuring the patents. Whatever recognition should be accorded petitioner's relation with Wheeler as that of a partner, the practical effect of the contract was simply to vest petitioner with a right to 60 per cent of Controlair's net profits in consideration of the use of space rent-free. And petitioner did not even contribute the space, although it agreed to do so. The testimony on this point is very clear:

> Q. Mr. McClelland, did you furnish the space for that [Controlair business] or did H. S. McClelland, Inc., furnish the space?
> A. I did.
> Q. Did it put any money into this partnership?
> A. No. No money whatsoever.

There is no evidence that McClelland transferred the building to petitioner, and it would thus appear that petitioner paid no consideration in cash, space, or services for its right to 60 per cent of the profits from Controlair. The most that the record shows is the initial loan of a few tools and occasional conferences between Wheeler and McClelland, petitioner's chief stockholders.

We have held a taxpayer entitled to relief under section 721 where it appeared that substantial money and effort had been devoted by it over a long period to the development of an article which produced substantial profits in a subsequent year and that there was some foundation for segregating and attributing a part of that profit to a prior year or years because of research andd evelopment. *Ramsey Accessories Manufacturing Corporation, supra; Producers Crop Improvement association,* 7 T. C. 562; *Rochester Button Co.,* 7 T. C. 529.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*