King, Quirk & Co., Inc. v. Commissioner.
King, Quirk & Co. v. Commissioner
Docket No. 72395.
United States Tax Court
T.C. Memo 1961-274; 1961 Tax Ct. Memo LEXIS 75; 20 T.C.M. (CCH) 1429; T.C.M. (RIA) 61274; September 29, 1961
*75 1. Bonuses paid to petitioner's three officer-stockholders in 1955, when added to their fixed salaries for that year, did not constitute unreasonable compensation for services rendered. 2. Fixed annual salary of petitioner's secretary-treasurer was not unreasonable compensation for the service he rendered. 3. Petitioner's secretary-treasurer did not own more than 50 percent in value of petitioner's stock in 1952 and 1953, and section 24(c), I.R.C. 1939, does not prevent the deduction of that officer's full salary accrued in those years but not paid until May 1954. 4. Petitioner has failed to prove that more than 50 percent of certain expenditures for club dues, entertainment, and flowers incurred by petitioner's three officer-stockholders and paid by petitioner corporation were ordinary and necessary business expenses. Rollin Browne, Esq., and Cecil Browne, Esq., 30 Broad St., New York, N. Y., for the petitioner. Dean P. Kimball, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioner's income tax for the taxable years ended May 31, 1954 and 1955, in the amounts of $9,337.26 and $41,137.96, respectively. *76 [1] The issues for decision are: (1) Whether the 1955 bonuses of petitioner's three officers, when added to their fixed salaries for that taxable year, constituted unreasonable compensation. (2) Whether the fixed annual salary accrued for petitioner's secretary-treasurer in the amount of $15,000 constituted unreasonable compensation to that officer, and if not, whether petitioner's deduction for such compensation was limited under the provisions of section 24(c) of the Internal Revenue Code of 1939 to the amounts of such compensation actually paid in 1952 and 1953. (3) Whether petitioner is entitled to deduct more than 50 percent of the club dues and charges and miscellaneous entertainment expenses incurred by its officer-stockholders and the floral expenses claimed by it on its returns for the taxable years 1954, 1955, 1956, and 1957. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York City. At all times pertinent *77 hereto petitioner has kept its books and filed its income tax returns on the accrual method and on the basis of a taxable year ended May 31. When there is reference herein to a taxable year it is deemed to refer to a fiscal year ended May 31. Its business is that of underwriting and selling municipal bonds. Petitioner timely filed its Federal income tax returns for the taxable years 1954, 1955, and 1956 with the district director of internal revenue for the Lower Manhattan District of New York. Petitioner was incorporated on May 19, 1949, at which time Joseph C. Quirk, William P. King, and Richard H. Migel (hereafter sometimes called Quirk, King, and Migel, respectively) each acquired 2,000 shares of petitioner's common stock, having a par value of $10 per share. Each paid $25,000 for his shares of common stock. Migel also acquired 500 shares of petitioner's 6 percent cumulative nonvoting nonparticipating preferred stock, having a par value of $50 per share, for which he paid the sum of $25,000. The preferred stock was redeemable at $55 per share. Except for the foregoing shares of common and preferred stock, no shares of petitioner's stock have been issued or outstanding. There have *78 been no sales or transfers of any of the stock of petitioner, except that on January 1, 1954, petitioner purchased from Migel his 500 shares of preferred stock for which petitioner gave Migel its notes in the amount of $25,000. None of these notes have been paid but interest has been paid on them at the rate of 6 percent per annum. The shares of preferred stock have not been reissued. During the period under review Quirk was president of petitioner, King was vice president, and Migel was secretary-treasurer. In 1958 King became president when Quirk decreased his activity in the company because of ill health. King started in the securities business in 1929. From 1933 to 1940 he was employed by Lazard Freres & Company, an investment banking firm. From 1940 to 1942 he was a partner in and manager of the New York office of Kaiser and Company, an investment banking firm of San Francisco. From 1942 to 1949, when he helped form petitioner, he was vice president and manager of the New York office of Harris, Hall and Company, a Chicago investment banking firm. Before 1949 Quirk had had his own personal bond business since 1930, except for the period 1942 to 1945 when he was in the Armed Forces. *79 Migel was educated at a preparatory school, attended Wesleyan University, and graduated from Babson Institute in 1935, when he went to work for the American Radiator Company. In 1936 he began working for Hemphill, Noyes & Company (hereafter referred to as Hemphill), an investment and stock brokerage firm in New York. He started as a messenger at a salary $15of per week. He was a trainee with no experience, learning the investment business, and his low pay was ordinary for such trainees. At this time the investment banking business was suffering from the depression. He later worked in various departments of Hemphill, learning the different phases of the business. However, he never worked in the sales department at Hemphill and he was not called upon to devote any time or attention to getting customers for the firm. By 1942 Migel was earning $50 per week and working in the buying department, where the employees were concerned with preparing new bond issues for salesmen in the selling department. The more important departments in Hemphill were the buying and selling departments and employees in these departments were usually more highly paid, both by base salaries and by extra compensation, *80 than other employees. It was possible for employees in the sales departments to earn extra compensation by placing or selling securities brought in by the buying department, and it was possible for employees in the buying department to earn extra compensation by bringing in a new underwriting or a deal. This pattern of compensation was typical for investment banking firms in New York City. Until 1942 when he went into the buying department, Migel had no opportunity to earn extra compensation at Hemphill. In 1942 Migel enlisted in the army as a private. He was assigned to the Supply Division of the Air Technical Service Command, and in 1945 he was discharged as a major. His duties involved the purchasing and distribution of supplies, and he received a commendation for his work. Migel returned to the buying department of Hemphill when he was discharged from the army in 1945. His salary when he returned was $100 per week. He had no administrative or financial responsibilities with the firm. His duties included working on plans of reorganization, merger, financing and recapitalization, filed and office analyses of companies and products, and security analysis and investment analysis service. *81 Migel's business income for the years 1946, 1947, and 1948 was $5,300, $5,100, and $5,200, respectively. In 1949 when he left Hemphill, Migel's salary was about $6,000 per year. This was his base salary; he would have participated in bonuses and, in 1949 after he went with petitioner, Migel received a bonus from Hemphill in the amount of $1,200. Migel's progress with Hemphill was about average for that firm and for the financial area of New York City generally. It was in line with others in the same circumstances. Migel's immediate supervisor in the buying department at Hemphill left that firm shortly before Migel did and has since become president and chairman of the executive committee of a large, publicly held corporation. Migel's supervisor in the research department at Hemphill became a partner in that firm after Migel left. In early 1949 Migel had several opportunities to leave Hemphill. He was offered the chance to become head of the New York branch of a medium-sized Chicago investment banking firm at an annual salary of $10,000 plus bonuses. Migel did not take this opportunity because he wanted to be in the home office of any firm with which he might be connected. Also, he *82 was approached about the possibility of becoming assistant treasurer of the subsidiary of a large oil company at a starting salary of $10,000 to $15,000 per year, but he did not follow up the opportunity because he did not want to leave New York City. Migel was approached by Quirk and King, who told him that they were starting a new firm which would require some capital and asked him if he would be interested in coming with them. Migel, who was well connected, enjoying the acquaintance of wealthy men of influence in finance, and who was active and prominent in civic and philanthropic affairs, knew Quirk as one of the leading municipal bond salesmen in the area and he knew that King was the vice president of a respected investment banking company. He told them that he was interested and they met several times before they decided to form petitioner. Under the original plan for the capitalization of petitioner, Quirk and King were to put up $25,000 each in common stock of petitioner; Migel was to put up $25,000 in common stock and $25,000 in preferred stock. A personal friend of Quirk was to put up a substantial amount in preferred stock but for reasons of health he decided not to do *83 it. The three men talked to bankers and found they could obtain loans for which they could put up purchased securities as collateral. Such ability to obtain loans was vital to petitioner's business and was dependent upon the personal reputations of Quirk, King, and Migel among bankers. The three men thereupon decided to go ahead with their own capital and they incorporated petitioner. During the period here involved petitioner's business was divided into two interrelated types. Petitioner joined with other underwriters in forming syndicates to bid for new issues of bonds. Petitioner also engaged in buying and selling securities as a dealer. The syndicate work was done by King and Migel, who also engaged in the buying and distribution of securities and buying for inventory. Quirk attended primarily to selling and distribution. On June 27, 1949, the directors of petitioner, who were King, Quirk, and Migel, fixed the salaries of the officers. The annual salaries of King and Quirk were fixed at $25,000 each; that of Migel was fixed at $15,000. However, at a meeting held on June 28, 1951, the directors adopted a resolution directing that each officer be paid $1,000 monthly on account of *84 his salary and the balance when the directors deemed advisable. At a meeting of the directors on August 21, 1951, it was determined that the president and vice president were to be paid the sum of $1,500 each per month on account of salary and the secretary-treasurer was to be paid $1,250 per month and the balance when the directors deemed advisable. On August 25, 1952, the directors adopted a resolution providing that Quirk and King were each to be paid $1,250 and Migel $1,000 per month on account of their salaries and the balance when the directors deemed advisable. At a meeting of the directors on October 20, 1953, QUIRK, AS CHAIRMAN, STATED THAT HE BELIEVED THAT THE THEN IMPROVEMENT IN BUSINESS WOULD CONTINUE FOR SOME TIME AND THAT LARGER PAYMENTS ON ACCOUNT OF SALARY COULD BE MADE TO THE OFFICERS. It was resolved that King and Quirk be paid $1,666.67 per month each and that Migel be paid $1,083.33 per month. On January 20, 1954, the directors decided to pay the officers currently the full amount of their salaries as fixed at the meeting of June 27, 1949. At a meeting held May 14, 1954, the directors decided that King and Quirk should each be paid the sum of $12,500, representing *85 unpaid salary for 1952 in the amount of $8,000 and for 1953 in the amount of $4,500. They further decided that Migel was to be paid the sum of $3,000, representing unpaid salary for 1952 in the amount of $500 and for 1953 in the amount of $2,500. The remaining unpaid salaries of King and Quirk for the year 1953 in the total amount of $9,142 were paid pursuant to a resolution adopted by the directors at a meeting held January 3, 1955. [2] At the same meeting it was resolved that King and Quirk be paid a bonus of $12,500 each and that Migel be paid a bonus of $7,500. These bonuses were intended to compensate the officers in part for work performed in prior years when no bonuses were paid them. During the period involved petitioner also paid bonuses to Quirk and King in the taxable year 1951 in the amount of $7,500 each and to Migel in the amount of $4,500. Petitioner paid bonuses to its employees other than the officers in each of the taxable years 1949 through 1956. It was a common practice in the Wall Street area for firms similar to petitioner to pay bouses to officers and employees, *86 usually around the end of a calendar year. Sometimes the amounts of such bonuses were a matter of publicity and comment in the area. Petitioner paid dividends on its common and preferred stock on a calendar year basis as follows: Paid during
Pair for
year ended
year ended
Dec. 31 - Dec. 31 - Common
Preferred
1949
1949
$ 875
1950
1950
$8,400
1,500
1951
1952
1953
1951
1,500
1952
1,500
1953
1,500
1954
1955
1956
1957
Petitioner reported an earned surplus at the end of the taxable years 1950 and 1955. It reported deficits in earned surplus at the end of the taxable years 1951, 1952, 1953, 1954, 1956, and 1957. Had petitioner in 1949 sought the services of an officer with Migel's background and experience for the duties which he was to perform and used the services of an executive placement agency in finding such a person, petitioner would have been advised by the agency to offer a salary of about $21,000 per annum in order to attract such an employee. For the taxable year 1955 petitioner's gross sales from both direct sales and syndicate participations exceeded the highest gross sales for a previous taxable year by approximately $2,879,700. Petitioner claimed deductions for selling and entertainment expenses in *87 each of its taxable years 1954, 1955, 1956, and 1957 in the total amounts of $4,523.26, $4,262.40, $4,374.55, and $3,839.11, respectively. Respondent disallowed one-half of each of the above totals claimed for the reasons that the amounts disallowed were not ordinary and necessary, were deemed to be personal, and had no direct relation to the conduct of petitioner's business. The totals claimed on the returns, which were either paid directly by petitioner or were reimbursed to the officers, were comprised of the following expenses incurred by the officers and for the purposes indicated: Year ended May 31, 1954
Dues and as-
Incurred by:
sessments
Charges
Misc.
Joseph C. Quirk -
The Recess
$ 360.00
$ 812.36
Blind Brook Club
690.00
655.31
Municipal Bond
Club of N. Y.
30.00
Misc. entertain-
ment
$ 3.00
William P. King -
City Midday Club
240.00
532.61
Old Field Club
180.00
75.00
Municipal Bond
Club of N. Y.
30.00
Bond Club of N. Y.
25.00
Kappa Beta Phi
Wall St. Chapter
30.00
Misc. entertain-
ment
100.00
Richard H. Migel -
Broad Street and
lunch clubs
270.00
291.23
Bond Club of N. Y.
25.00
Misc. entertain-
ment
52.80
Miscellaneous -
Gifts of flowers to
customers or in
sympathy at
death
120.95
Total
$1,880.00
$2,366.51
$276.75
Year ended May 31, 1955
Joseph C. Quirk -
The Recess
$ 375.00
$ 512.89
Blind Brook Club
680.00
698.19
Municipal Bond
Club of N. Y.
30.00
William P. King -
City Midday Club
240.00
549.02
Old Field Club
190.00
175.41
Municipal Bond
Club of N. Y.
30.00
Bond Club of N. Y.
25.00
Kappa Beta Phi
Wall St. Chapter
30.00
Misc. entertain-
ment
$115.00
Richard H. Migel -
The Lunch Club
212.50
241.82
Bond Club of N. Y.
25.00
Misc. entertain-
ment
38.57
Miscellaneous -
Gifts of flowers to
customers or in
sympathy at
death
94.00
Total
$1,837.50
$2,177.33
$247.57
Year ended May 31, 1956
Joseph C. Quirk -
The Recess
$ 406.26
$ 643.08
Blind Brook Club
510.00
600.72
Municipal Bond
Club of N. Y.
30.00
Misc. entertain-
ment
$112.50
William P. King -
City Midday Club
250.00
831.78
Old Field Club
92.92
Municipal Bond
Club of N. Y.
30.00
Bond Club of N. Y.
25.00
Kappa Beta Phi
Wall St. Chapter
30.00
Richard H. Migel -
The Lunch Club
250.00
257.96
Bond Club of N. Y.
25.00
Misc. entertain-
ment
114.26
Miscellaneous -
Gifts of flowers to
customers or in
sympathy at
death
165.07
Total
$1,556.26
$2,426.46
$391.83
Year ended May 31, 1957
Joseph C. Quirk -
The Recess
$ 431.26
$ 511.14
Blind Brook Club
720.00
553.93
William P. King -
City Midday Club
250.00
895.06
Bond Club of N. Y.
25.00
$ 20.00
Municipal Bond
Club of N. Y.
Kappa Beta Phi
Wall St. Chapter
30.00
Richard H. Migel -
The Lunch Club
250.00
97.72
Bond Club of N. Y.
25.00
Total
$1,761.26
$2,057.85
$ 20.00
*88 Petitioner has failed to prove that more than one-half of the foregoing total expenditures in any year constituted business expenses of petitioner. To the extent that such nonbusiness expenditures were for the personal benefit of petitioner's officers, they have not been shown to have been additional compensation. The amounts paid petitioner's officers as salary and bonuses in the taxable year 1955 represented, in the case of each officer, a reasonable allowance for personal services actually rendered. A reasonable allowance for salary (excluding bonus) for Migel in each of the years 1952 through 1957 was no less than $15,000 per year. During the period prior to January 1952 Migel did not own, directly or indirectly, more than 50 percent in value of the outstanding stock of petitioner. Opinion The deficiencies determined by respondent relate to the taxable years 1954 and 1955. However, because of net operating loss deductions attributable to net operating loss carryovers and carrybacks, the years 1952, 1953, 1956, and 1957 are also involved. The parties are in agreement as to the net operating loss carryover from the taxable year 1951; they disagree as to net operating losses for 1952, *89 1953, 1956, and 1957. [3]
Issue 1 For the taxable year 1955, petitioner paid King and Quirk each a bonus of $12,500, and a bonus of $7,500 was paid to Migel. In each instance the bonus was 50 percent of the officer's regular annual salary. The first issue is whether the amounts, when considered with the base salaries paid these officers, constituted "reasonable *90 [allowances] * * * for personal services actually rendered," so as to be deductible under section 162(a) (1) of the Internal Revenue Code of 1954. Whether amounts paid employees represent reasonable compensation for services rendered is a question of fact to be determined on the basis of the particular circumstances in each case. Huckins Tool and Die, Inc. v. Commissioner, 289 F. 2d 549 (C. A. 7, 1961), affirming a Memorandum Opinion of this Court; Ecco High Frequency Corp. v. Commissioner, 167 F.2d 583 (C.A. 2, 1948), affirming a Memorandum Opinion of this Court, certiorari denied 335 U.S. 825 (1948); Long Island Drug Co. v. Commissioner, 111 F. 2d 593 (C.A. 2, 1940), affirming 35 B.T.A. 328 (1937), certiorari denied 311 U.S. 680 (1940); Geiger & Peters, Inc., 27 T.C. 911 (1957). The resolution of the instant issue does not require an extended discussion of the multitude of cases on the subject; each case must, as does the present one, turn on its own facts. But there can be derived from the authorities certain factors which are to be taken into account in deciding the question of reasonable compensation. The weight to be accorded each of such factors may vary depending upon *91 the circumstances; no one factor is conclusive. Also, neither the presence nor the absence of any one factor in a case is to be overemphasized, but the absence of evidence on a point is to be considered in deciding whether petitioner has borne successfully its burden of proof as to the reasonableness of the compensation sought to be deducted. See Miles-Conley Co. v. Commissioner, 173 F. 2d 958 (C.A. 4, 1949), affirming 10 T.C. 754 (1948). Among the factors to be considered are the nature of the services actually rendered by the employee, see e.g., W. T. Wilson, 10 T.C. 251 (1948), affd. 170 F.2d 423 (1948), certiorari denied 336 U.S. 909 (1949); the results attributable to such services as opposed to other determinants, see e.g., E.B. & A.C. Whiting Co., 10 T.C. 102 (1948); whether the taxpayer received the undivided attention and the full-time services of the employee in return for the compensation, see e.g., Midland Ford Tractor Company v. Commissioner, 277 F. 2d 111 (C.A. 8, 1960), affirming a Memorandum Opinion of this Court; Miles-Conley Co., 10 T.C. 754 (1948), affd. 173 F. 2d 958 (C.A. 4, 1949); Miller Mfg. Co., Inc. v. Commissioner, 149 F. 2d 421 (C.A. 4, 1945), *92 affirming a Memorandum Opinion of this Court; whether the amounts denominated as compensation are paid to employee-stockholders in approximate proportion to the shareholdings, see e.g., Huckins Tool and Die, Inc. v. Commissioner, supra; Soabar Co., 7 T.C. 89 (1946); California Vegetable Concentrates, Inc., 10 T.C. 1158 (1948); the taxpayer's payment of dividends as such, see e.g., Streckfus Steamers, Inc., 19 T.C. 1 (1952); a comparison between the compensation in dispute and compensation (either total or as a rate per products sold) for other years when the employee's duties and responsibilities were about the same, see e.g., Adams Tooling Inc., 33 T.C. 65 (1959), affd. 289 F. 2d 554 (C.A. 7, 1961); cf. Ernest Burwell, Inc. v. United States, 113 F. Supp. 26 (W.D.S.C. 1953), with Faucette Co., 17 T.C. 187 (1951); the gross and net incomes of the taxpayer and the relationship, if any, between compensation and the taxpayer's financial operation and condition, see e.g., Burford-Toothaker Tractor Co. v. Commissioner, 192 F. 2d 633 (C.A. 5, 1951), affirming a Memorandum Opinion of this Court, certiorari denied 343 U.S. 941 (1952); Federal Machine & Welder Co., 11 T.C. 952 (1948), *93 affirmed per curiam 184 F. 2d 843 (C.A. 6, 1950); Kerrigan Iron Works, Inc., 17 T.C. 566 (1951); a comparison between the disputed compensation and amounts paid by comparable enterprises for similar work, see e.g., Millspaugh Bldg. Corp. v. Commissioner, 192 F. 2d 887 (C.A. 2, 1951), affirming a Memorandum Opinion of this Court; Locke Mach. Co. v. Commissioner, 168 F. 2d 21 (C.A. 6, 1948), affirming a Memorandum Opinion of this Court, certiorari denied 335 U.S. 861 (1948); Gus Blass Co., 9 T.C. 15 (1947); cf. Wm. J. Lemp Brewing Co., 18 T.C. 586 (1952); Faucette Co., supra., the background and training of the employee, his previous earning capacity and his suitability for the tasks which he performed for the taxpayer, see e.g., Coe Laboratories, Inc., 34 T.C. 549 (1960); Eitel-McCullough, Inc., 9 T.C. 1132 (1947); whether the compensation has been fixed at the end of a financial year when profits can be estimated with accuracy, see e.g., Kennedy Name Plate Co. v. Commissioner, 170 F. 2d 196 (C.A. 9, 1948), affirming a Memorandum Opinion of this Court; Ecco High Frequency Corp. v. Commissioner, supra; whether the taxpayer's method of compensating its employees is in accordance *94 with customary practices in its industry (although even "usual" fees or bonuses will not be allowed unless they constitute otherwise reasonable compensation for significant services actually performed), see e.g., Huckins Tool and Die, Inc. v. Commissioner, supra; F. E. McGillick Co., 30 T.C. 1130 (1958), affd. 278 F. 2d 643 (C.A. 3, 1960); Ecco High Frequency Corp. v. Commissioner, supra; whether the tax-avoidance motive of securing a deduction in a year of high corporate income or excess profits tax rates may have prompted the decision to pay the purported compensation, see e.g., Builders Steel Co. v. Commissioner, 197 F. 2d 263 (C.A. 8, 1952), affirming a Memorandum Opinion of this Court; Midland Ford Tractor Company v. Commissioner, supra; and whether the amount claimed as compensation was in fact intended as such, see e.g., Branditjen & Kluge, Inc., 34 T.C. 416 (1960). The parties do not disagree on the governing principles which will resolve the instant question; respondent does not take the arbitrary position that bonuses paid to officers are not deductible simply because paid to officers who are also the only stockholders and directors of a corporation. The applicable *95 section of the Income Tax Regulations relating to bonuses is set forth in the margin. [4] *96 The provisions have been substantially the same since promulgated as article 107, Regs. 62, issued under the Revenue Act of 1921. Essentially, the test of the deductibility of bonuses under the applicable regulations is whether such bonus payments, when added to the employee's regular salary, exceed a reasonable compensation for services rendered; such bonuses are deductible as compensation only to the extent that they do not exceed such reasonable compensation. Respondent argues, however, that the bonuses in question should be subjected to a particularly severe scrutiny to assure that they are not distributions of earnings. Of course, in a close corporation, in which the directors and stockholders are also the officers to be compensated, it may be difficult to find an arm's-length transaction fixing the compensation. There can be little bargaining at a table at which the parties sit on both sides. We therefore agree with respondent that compensation paid by a closely held corporation to its controlling stockholders warrants a close review. In determining that the amounts sought to be deducted constitute reasonable allowances for services actually rendered, and are otherwise ordinary and necessary to the conduct of petitioner's business, it must necessarily appear from the evidence that the "compensation" is, in fact, no more than it is labeled; to the extent that it is in reality a distribution of earnings, it is not deductible. It is incumbent upon petitioner to show by a preponderance of the evidence that the total amounts paid each of the officers, Quirk, King, and Migel, as salary and bonus, for the *97 year 1955 were compensation that was reasonable. Petitioner should demonstrate that fact with respect to amounts paid each officer individually. See L. Schepp Co., 25 B.T.A. 419 (1932); and Shield Co., 2 T.C. 763 (1943). But the factors used in determining the reasonableness of an officer-stockholder's compensation, except those bearing on the close relationship, are no different than those used in determining the reasonableness of the compensation of a nonstockholder-officer. A stockholder is no less valuable to a corporation as an officer simply because he is a stockholder. With these principles in mind we approach the evidence. Petitioner was engaged in a highly specialized field, that of a dealer in municipal securities. It was organized in 1949 by Quirk, King, and Migel. Quirk had been in the business of selling bonds since 1930. His earnings from his own business for the 3 years before his association with petitioner exceeded his salary during the years under review. King had been a partner or officer successively in two investment firms. Migel had been employed by an investment banking firm. It is clear from the evidence that the success or failure of petitioner depended to *98 a large extent on these three men and their abilities. Gross sales in each year were extremely high compared to the capital of the firm. Petitioner's evidence points to the conclusion that such amounts of gross sales could be handled only because financing of bond purchases could be obtained from banks. Taking into account that such financing was secured by using the bonds as collateral, loans were obtainable primarily because of the personal reputations of petitioner's three officers. Petitioner's net worth alone would not have justified the financing that was required for petitioner's dealings. Quirk, King, and Migel brought together the background, training, ability, and experience when petitioner was organized that were the results of many years spent in the financial field. Although petitioner was involved in a specialized segment of the investment business, it was a small firm, and its three officers were called upon to be proficient in all phases of the business; basically, they had to be well informed and capable in both buying and selling. King and Migel were engaged in syndicate and joint venture operations and in purchasing; they also made direct sales. Until his retirement, *99 Quirk was principally engaged in selling. As one witness, a partner in one of petitioner's competitor firms, explained, petitioner operated at the "institutional level" with low capital. A high degree of skill and some salesmanship were required in the direct sales work in which all three of petitioner's officers participated. Such men, testified the same witness, deserve - and in the business generally receive - more generous bonuses than do the men whose abilities are directed to only a single phase of the business. Petitioner's evidence shows that compensating by bonus is customary in its field. Employees expect to receive, and employers expect to pay, bonuses based on time spent during the year, specific results obtained, and loyalty to the firm. Migel received such a bonus shortly after he left Hemphill based on a result which he had helped to accomplish there. Had he stayed with that company, he would have expected to participate in further bonuses. It was also customary for such bonuses to be paid at some time near the end of the calendar year. In some instances, according to petitioner's evidence, such bonuses paid by dealers and brokers are a matter of publicity at yearend. *100 Because of our concern with loss carryovers, we have reviewed taxable years from 1951 through 1957. We have had the benefit of evidence concerning the period when petitioner was first organized through a period of seeming stability, periods of losses, and a period of relative prosperity. In June 1951, in an effort to conserve cash, the officers took a postponement of a portion of the monthly payments of their salaries. The same action was taken in August 1952. Interest on obligations owed to officers was on occasion postponed. Toward the end of the calendar year 1950 (in the taxable year 1951), the officers were paid a bonus equal to 30 percent of their salaries, and respondent does not suggest that all or any part of such bonuses should be disallowed. We note that the ratio of officers' compensation to gross sales (both direct and in participation) for the taxable year 1951 was almost the same as the ratio of officers' compensation to such gross sales for the taxable year 1955, when the 50 percent bonuses in controversy were paid; for the taxable year 1951, there was a loss; and for the taxable year 1955, substantial net income was reported after deduction of the contested deductions. *101 The bonuses paid in 1955 were motivated not merely by good current income but also by a desire to compensate for the years when no bonuses were paid. Viewed in this light, the 50 percent figure is not strikingly high. Respondent's principal argument seems to be, in effect, that the bonuses were not warranted by petitioner's earnings and must be deemed to be dividends, merely labeled as compensation. Passing for a moment the inconsistency of an argument that advances the notion that there is not enough money to pay compensation but there is enough money to pay dividends, we note that no dividends were paid for the taxable year 1955. But we are convinced that petitioner's directors and officers did not intend to siphon earnings in the form of bonuses. The decisions to pay bonuses and to distribute earnings are primarily those of petitioner's directors, at least in the first instance. We can only review those decisions to determine that they are made in good faith, that a distribution of earnings is not given the guise of compensation, and that compensation, even when determined to be such, is no more than reasonable. We have often noted that it is not possible to determine reasonableness *102 with mathematical precision; we can only find a range in which compensation may be allowed. We note a fact we consider to be significant in weighing several factors in this case - that the bonus paid in the taxable year 1955 was not computed at the end of the taxable year, when profits would ordinarily be distributed, but was paid in the middle of the taxable year, shortly after the beginning of the calendar year. Not only does this fact tend to show that the bonuses were not disguised dividends, but it supports petitioner's contention that its bonuses were paid in accordance with customary practice in the area to pay employee bonuses around the first of a calendar year. And not only was petitioner's payment of bonuses to its three officers in line with established practice in the area, but it was consistent with petitioner's general policy of paying substantial bonuses to employees other than the officers. We are convinced by the testimony of petitioner's officer-directors and the other factors mentioned above that the bonuses paid to the three officers in 1955 were not disguised dividends. As for the reasonableness of the total compensation paid for the services rendered by the officers, *103 our Findings of Fact set forth the services actually rendered by them in some detail. Suffice it to say here that petitioner's officers performed ably and competently in bringing the corporation through two periods of decline in inventory values. The fact that petitioner is active today is evidence of its officers' caliber. The growth of petitioner is due primarily to their efforts, not to their capital. Thus, whatever results have been accomplished on petitioner's behalf have been accomplished by the skill and acumen of its officers. The parties agree that petitioner had the benefit of the full-time services of King, Quirk, and Migel during the years in controversy. The officers received more compensation in 1955 than in other taxable years. It does not appear that their duties and responsibilities differed materially in that taxable year as compared to earlier years. However, the bonuses given in the taxable year 1955 were intended to compensate the officers in part for their work in prior taxable years. This is only reasonable; a bonus is ordinarily paid in a good year, not in a bad one. If the principle of compensation by bonus be accepted - as it is - it must be granted that a *104 bonus is as consistent with good earnings as is a dividend. Petitioner's officers' efforts in taxable years 1952, 1953, and 1954 were achieving tangible results by January 1955; this was the logical time to compensate them. This fact bears also on the point regarding the relationship between petitioner's financial condition and the bonuses. Petitioner's gross sales for the taxable year 1955 were about $2,879,700 over the highest similar figure for prior taxable years. Petitioner reported a deficit in earned surplus at the end of the taxable year 1954. At the end of the succeeding taxable year an earned surplus was shown on the return. There was substantial taxable income reported for the taxable year 1955, after accrual for officers' compensation. There was a definite relationship between the earnings and financial status of petitioner and the bonuses in the taxable year 1955. The relationship was consistent with payments of bonuses. Petitioner adduced evidence that persons who performed duties and carried responsibilities similar to those of petitioner's officers would have earned in comparable firms in the area compensation roughly equal to, or more than, the compensation paid to *105 Quirk, King, and Migel. Petitioner's witnesses were well informed, qualified, and experienced. They testified that they considered the reasonableness of the compensation paid petitioner's officers in the taxable year 1955 from the viewpoint of employers, not employees. While one witness testified that he could not give an opinion based on ability of a firm to pay such compensation, he did state that his firm could not pay petitioner's officers any less than they were compensated by petitioner. This testimony by petitioner's competitors located in its area supports petitioner's contentions and we believe it is entitled to considerable weight. Suffice it to summarize here that the background and training of King, Quirk, and Migel, which were suited for the offices in which they served petitioner, and the services rendered by them would have commanded compensation from other firms in line with that paid by petitioner. As shown by our findings, there is no connection between the officers' stockholdings and their compensation, including bonuses. In fact the very disparity between the compensation paid Migel, who owned one-third of the common stock of petitioner, and the compensation paid *106 Quirk and King, who each held one-third of the common stock, indicates that the bonuses in question were not disguised distributions. We have heretofore noted that petitioner paid no dividends for the taxable year 1955. The need for working capital would have justified retention of net earnings after reasonable compensation was paid. Obviously petitioner was not in the position of having surplus which would have attracted the imposition of the surtax on accumulated earnings; it was not confronted with the necessity of declaring dividends, paying "bonuses," or incurring the surtax. In view of all the evidence, we consider the failure to pay dividends in the taxable year 1955 of little importance. We find no tax-avoidance motive behind taxpayer's payments of bonuses in the taxable year 1955. Considering all the evidence in the light of the factors set forth above, we are convinced that the compensation paid petitioner's officers for the taxable year 1955, including bonuses, represented, in each instance, a reasonable allowance for personal services actually rendered. Issue 2 The second issue is concerned with the reasonableness of Migel's salaries during the taxable years 1952 through *107 1957. Much of what we have said pertaining to the first issue is applicable here. Considering the facts of record in the light of those relevant factors set forth above, we have concluded that Migel's salary as fixed by petitioner was reasonable and that it represented compensation for services actually rendered. It is enough to repeat that Migel's qualifications when he started to work for petitioner justified his salary from petitioner, he has obviously proved to be quite valuable to petitioner, and petitioner would ordinarily have had to pay at least as large a salary as it did to have attracted a person of Migel's qualifications in 1949. He was well equipped for the job and while his background had been in corporate financing, he obviously learned the municipal bond business rapidly and well. His responsibilities, duties, and position in the field justified his compensation at the beginning and soon his results also warranted his salary as well as the bonus paid him in the taxable year 1955. For some reason, respondent does not question his salary and bonus for 1951, a taxable year before the Court, in which Migel's salary was $15,000 and he was paid a bonus of $4,500. This issue *108 is also concerned with the applicability of the provisions of section 24(c) of the Internal Revenue Code of 1939[5] *110 as to part of Migel's salary. [6] *111 Briefly stated, petitioner was on an accrual basis; Migel reported on a cash basis. For the taxable years 1952 and 1953, $3,000 of Migel's salary was "postponed"; this amount was not actually paid to Migel until the taxable year 1954. The payment was authorized by petitioner's directors on May 14, 1954, and apparently was paid on May 28, 1954. Up to January 1, 1954, Migel owned 500 shares of the $50 par value preferred stock of petitioner for which he paid $25,000; throughout the period he owned 33 1/3 percent of petitioner's $10outstanding par value common stock for which he also paid $25,000. King and Quirk each owned 33 1/3 percent of the common stock, for which they each paid $25,000, and neither owned any preferred stock. The $5,000 each stockholder paid for common stock over the par value thereof was treated on petitioner's books as paid-in surplus. Petitioner contends that Migel did not own "more than 50 per centum in value of the outstanding stock" of petitioner; respondent maintains that he did, and therefore section 24(c) of the *109 1939 Code prevents deduction in any year of that portion of Migel's base salary not paid to him in the year accrued or 2 1/2 months thereafter. Respondent made no determination with respect to this issue and it is not directly raised anywhere in the pleadings, although both parties recognized it as an issue at the beginning of the trial. Under the circumstances, we do not think petitioner has the burden of proving that Migel did not own more than 50 percent in value of petitioner's stock, cf. Lenox Clothes Shops v. Commissioner, 139 F. 2d 56 (C.A. 6, 1943), affirming in part and reversing in part 45 B.T.A. 1122 (1941); rather we think it must affirmatively appear from the evidence that Migel did own more than 50 percent in value of the stock before section 24(c) will be applied to disallow the deduction, particularly where the effect of section 24(c) is to disallow forever an otherwise allowable deduction, see North American Service Co., 33 T.C. 677 (1960), and where, as here, there is no evidence of a tax-avoidance *112 motive in delaying payment of the salary. For a discussion of the congressional purpose in enacting this provision, see Musselman Hub-Brake Co. v. Commissioner, 139 F.2d 65 (C.A. 6, 1943), reversing a Memorandum Opinion of this Court. Petitioner admits that Migel's stock during the taxable years 1952 and 1953 totaled more than 50 percent of the par value [7] *113 of petitioner's outstanding stock and also equaled more than 50 percent of the book value [8] of petitioner's outstanding stock. But petitioner argues, and respondent agrees, that the test is fair market value. While this case points up that fair market value is a very uncertain measure of the "value" of stock of a closely held corporation, this test finds some support in the Senate Finance Committee report [9] on section 24(b) when it was originally enacted, wherein the Senate Committee pointed out that it had changed the House version of the bill by substituting a standard of 50 percent in value of the stock for the standard "the majority of the voting stock" used by the House. We doubt that either the preferred or the common stock had any ready marketability in 1952 and 1953. The business was relatively new and in a specialized field where one bad decision by any officer might well wipe out all the firm's capital. It was losing money at the time and had a surplus deficit. While if the firm had liquidated at that time the preferred stock might have realized more than one-third of the common, there is nothing to indicate that liquidation was contemplated or that the preferred had any voting rights that could force liquidation. The only evidence on relative values, aside from the accounting evidence, was the testimony of both King and Migel that because of the growth possibilities, they thought the common was more valuable than the preferred. Apparently the preferred had no voting rights and was callable. It is certain *114 that Migel could not control the affairs and destinies of the corporation by virtue of his preferred holdings. We cannot determine from the record which stock was more valuable, although we are inclined to agree with King and Migel that in a corporation such as this, where control is very important and the possibilities for substantial growth are present, the common stock was more valuable than the preferred. We also note that the preferred was redeemed for $25,000 in January 1954. In this situation we cannot find that Migel owned more than 50 percent in value of the outstanding stock, and hence section 24(c) does not prevent the deduction of his full base salary in the years 1952 and 1953 when it accrued. Issue 3 The third issue involves a deduction of various expenses claimed by petitioner as business expenses during the taxable years 1954, 1955, 1956, and 1957. There is no question about substantiation; respondent agrees that the claimed expenditures were actually made, but he has disallowed 50 perment of such expenses on the ground that they represent personal expenses of petitioner's officers. The expenses consist of various bond, luncheon, and beach clubs dues, assessments and *115 charges, and miscellaneous entertainment charges either paid by the corporation for each of the three officer-stockholders or reimbursed to the officers by the corporation, and the cost of messages of condolence and flowers sent on the occasion of sickness or death of a good customer of the firm by and in the name of one of the officers but paid for by the corporation. Special scrutiny is usually given to deductions claimed by a closely held corporation for expenses paid by and reimbursed to its officer-stockholders for entertainment and other expenditures of a nature which might be personal to the officer-stockholders; and we think rightfully so, because experience indicates that this is an area in which many abuses have been practiced. Nevertheless, such expenditures are deductible by closely held corporate employers to the extent it is shown that the expenses were incurred for business reasons with a reasonable expectation of obtaining a business benefit to the corporation. In the situation we have here, where the three officer-stockholders produced all the business of the corporation and were also in a position to decide what expenditures incurred by them the corporation would *116 or would not pay, we believe a fair criterion for determining whether the expenses in question are deductible as ordinary and necessary business expenses by the corporation would be whether the expenses incurred by the individuals, if engaged in the same business in their individual capacities, would be deductible as ordinary and necessary business expenses by them. There is no proof that the expenses paid by the corporation were intended as additional compensation to the officers so the reimbursed expenses not otherwise deductible would not be deductible by the corporation as compensation to the officers. While we are not sympathetic with respondent's disallowance of a flat 50 percent of the total of a number of different items of expense, because of the burden it places on petitioner and the Court in determining which items have been disallowed and in proving wherein the Commissioner has erred, [10] nevertheless, in the absence of more specific pleadings, we believe the burden is on petitioner to at least prove that more than 50 percent of the total expenditures in controversy is deductible as ordinary and necessary business expense. This we believe petitioner has failed to do and *117 we have accordingly sustained respondent's determination on this issue. The evidence presented consists of the testimony of King and Migel regarding the nature of the various clubs they belonged to, the purposes for which they belonged, and the use they made of the clubs, particularly for taking customers and business associates to lunch, including estimates of the portion of the daily charges that was for their own food and drink and the portion that was for their guests. Quirk had retired from the business and was out of town at the time of trial and did not testify. King did testify, as an officer of the corporation, that the expenses incurred by Quirk were similar to those incurred by himself and Migel and were authorized by the corporation. Generally, dues to a social club are nondeductible personal expenses, and substantial evidence is required to support their deduction as a business expense. Western Products Co., 28 T.C. 1196 (1957). Entertaining one's associates is ordinarily a personal *118 expense and "presumptive nondeductibility of personal expenses may be overcome only by clear and detailed evidence as to each instance that the expenditure in question was different from or in excess of that which would have been made for the taxpayer's personal purposes." Richard A. Sutter, 21 T.C. 170, 173 (1953). Although the testimony of King and Migel is rather general, we do think it would probably be sufficient to prove that they joined the various bond clubs purely for business reasons and that they used the luncheon clubs, in part at least, for business purposes; and we also think the evidence justifies deduction of the cost of flowers and messages of condolence as a business expense of the corporation. However, even if we found that all of the bond club dues and the floral costs were deductible and that perhaps one-half or two-thirds of the luncheon club dues and charges incurred by King and Migel were business rather than personal expenses, we still could not find that petitioner has proved that more than 50 percent of the total expenses in question is deductible. This is because of the almost entire lack of proof of the business nature of any of the expenses incurred by *119 Quirk and any of the miscellaneous entertainment expenses incurred by all three officers. If we disallowed most of the latter two categories of expenses and also one-third to one-half of the luncheon club dues and charges incurred by King and Migel, which we think we would have to do on the record before us, the total allowable expenses would not equal more than the 50 percent of the total expenses claimed as allowed by respondent. Decision will be entered under Rule 50. Footnotes
1. The years 1952, 1953, 1956, and 1957 are also involved because of operating loss carrybacks and carryovers.↩
2. Petitioner deducted the back salary payments in the years paid, i.e., $28,000 in 1954 and $9,142 in 1955.↩
3. As we understand the stipulation of facts and statements made by counsel at the trial and in their briefs, the parties are now in agreement that all of the base salaries of Quirk and King were deductible in the years accrued, that all of Migel's base salary, to the extent found reasonable and paid in the years accrued for 1952 through 1957, was deductible in each of those years, and that our decision of the issues as to the reasonableness of the bonuses paid in 1955, the reasonableness of Migel's base salary, whether Migel owned more than 50 percent in value of petitioner's stock in 1952 and 1953, and whether the disputed deductions for club dues and charges and miscellaneous expenses were ordinary and necessary business expenses will be dispositive of all issues, including carryovers and carrybacks, for the years 1952 through 1957.↩
4. Sec. 1.162-9, Income Tax Regs. Bonuses to employees. - Bonuses to employees will constitute allowable deductions from gross income when such payments are made in good faith and as additional compensation for the services actually rendered by the employees, provided such payments, when added to the stipulated salaries, do not exceed a reasonable compensation for the services rendered. It is immaterial whether such bonuses are paid in cash or in kind or partly in cash and partly in kind. Donations made to employees and others, which do not have in them the element of compensation or which are in excess of reasonable compensation for services, are not deductible from gross income.
5. SEC. 24. ITEMS NOT DEDUCTIBLE. (c) Unpaid Expenses and Interest. - In computing net income no deduction shall be allowed under section 23(a), relating to expenses incurred, or under section 23(b), relating to interest accrued - (1) If within the period consisting of the taxable year of the taxpayer and two and onehalf months after the close thereof (A) such expenses or interest are not paid, and (B) the amount thereof is not includible in the gross income of the person to whom the payment is to be made; and (2) If, by reason of the method of accounting of the person to whom the payment is to be made, the amount thereof is not, unless paid, includible in the gross income of such person for the taxable year in which or with which the taxable year of the taxpayer ends; and (3) If, at the close of the taxable year of the taxpayer or at any time within two and one-half months thereafter, both the taxpayer and the person to whom the payment is to be made are persons between whom losses would be disallowed under section 24(b). The only pertinent "persons" here involved appear in subparagraph (B) of section 24(b)(1) as follows: (B) * * * an individual and a corporation more than 50 per centum in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual; ↩
6. Petitioner deducted the back salaries paid to each of Migel, King, and Quirk in the years paid; that is, 1954 and 1955. In the notice of deficiency respondent disallowed these back salary payments, together with the bonuses paid and $7,500 of Migel's current year's salary, on the ground that it was excessive compensation. It was stated at the trial and on brief that the parties agreed that the back salaries of all three officers, to the extent reasonable, should be deducted in the year accrued, that is, 1952 and 1953, unless prevented by section 24(c), I.R.C. 1939. See Clark v. Woodward Construction Co., 179 F. 2d 176 (C.A. 10, 1950). There being no claim that section 24(c) would prevent accrual of the salaries of King and Quirk and there being no claim that their basic salaries were excessive, the full amount of their salaries for 1952 and 1953 will be deductible in 1952 and 1953 and will be taken into consideration in computing the net operating loss carryovers from those years under Rule 50, and the back salary payments to them will not be deductible in 1954 and 1955. But having found that the entire basic salary of Migel was not excessive, we must determine whether section 24(c)↩ prevents accrual of the unpaid portion thereof in 1952 and 1953.
7. King and Quirk each owned 2,000 shares of $10 par value common stock, with a total par value of $40,000. Migel owned 2,000 shares of $10 par value common stock and 500 shares of $50 par value preferred stock, with a total par value of $45,000. 8. Petitioner admits that Migel's preferred stock had a greater book value than one-third of the common stock because petitioner had an earnings deficit up through fiscal 1953. ↩
9. S. Rept. No. 558, 73d Cong., 2d Sess., p. 27 (1934), 1939-1 C.B. (Part 2) 607.↩
10. Did respondent determine that one-half of each item included in the total, for instance one-half of Quirk's expenses, was deductible or only that one-half of the total was nondeductible?.↩